James BENJAMIN, et al., Plaintiffs,

v.

William J. FRASER, et al., Defendants.

No. 75 CIV. 3073(HB).

United States District Court,
S.D. New York.

Jan. 9, 2001.

.Daniel L. Greenberg, John Boston, Madeline H. deLone, Lisa Freeman, Dale

A. Wilker, Legal Aid Society, New York City, for Plaintiffs.

Michael D. Hess, Corporation Counsel of City of New York, Florence A. Hutner, June R. Buch, Coleen Chin, Of Counsel, New York City, for Defendants.

### Opinion and Order

BAER, District Judge.

## I. BACKGROUND

### A. Factual and Procedural Background

Defendants in this action, the City of New York and the Department of Corrections, et. al. (collectively the "Department") brought a motion to terminate the Consent Decrees and all supplemental orders entered in this action and the six related cases that are encompassed herein[1] under the Prison Litigation Reform Act of 1995 ("PLRA" or "the Act"), Pub.L. No. 104–134, 110 Stat. 1321, §§ 801–810 (Apr. 26, 1996).

The procedural background of the decrees is set forth in this Court's Opinion and Order dated June 5, 2000 (June 5th Order) and will not be repeated here except as is necessary. To summarize, the June 5th Order terminated the Consent Decrees pertaining to detainee correspondence and law libraries.[2] Thereafter, upon the joint submission of the parties, this Court entered an Order Re: Partial Termination of Consent Decrees and Supple-

---

1. The six related cases are: *Forts v. Malcolm,* 76 Civ. 101 (New York City Correctional Institute for Women), *Ambrose v. Malcolm,* 76 Civ. 190 (Bronx House of Detention for Men), *Maldonado v. Ciuros,* 76 Civ. 2854 (Adolescent Reception and Detention Center), *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 79 Civ. 4913, *Detainees of the Queens House of Detention for Men v. Malcolm,* 79 Civ. 4914, *Rosenthal v. Malcolm,* 74 Civ. 4854 (Adult Mental Health Center on Rikers Island). The Court will refer to all of the consent decrees and supplemental orders as the "Consent Decrees" or the "Decrees".

2. Correspondence and law libraries were addressed in respective sections "G" and "AA" of the Stipulation for Entry of Partial Final Judgment, dated November 21, 1978, annexed hereto as Appendix "1". [Editor's Note: Appendix deleted for Westlaw Purposes.]

mentary Orders, dated August 30, 2000, terminating numerous provisions of the Consent Decrees and certain additional orders.[3] By Order dated December 15, 2000 this Court terminated (pursuant to the PLRA) three additional orders related to the Consent Decrees.[4]

This Court's order of December 9, 1999 prescribed separate hearings for several groups of issues addressed by the Consent Decrees. The hearing on environmental health and the provision of personal hygiene supplies was held on May 8–10 and May 15–17, 2000 (the "May Hearings"). The May Hearings are the subject of this Opinion and Order.

It is worth underscoring at the outset that the Decrees cover the conditions of confinement for pre-trial detainees held on Rikers Island and several county facilities. The conditions of confinement applicable to convicted or sentenced prisoners are not an issue here.

**3.** See Docket Entry # 241:

**4.** The following orders were terminated: The Consent Order re: Contact Visits at NYC-CIFW, dated July 29, 1978, in *Forts v. Malcolm;* the Order re: Overcrowding, dated June 23, 1981, in *Consolidated Cases v. Malcolm;* and the Stipulation for Order re: Medical/Health Services, dated July 10, 1991, in *Consolidated Cases v. Malcolm.*

**5.** Debrille Bartee, Gamel Browne, Robert DeRosario, Wonder Fields (referred to as "Wanda" in the transcript), Richard Fischetti, Kelly Fry, Alexander Gregory, Mary Johnson, Richard Johnson, Robert Jones, Dorian Miles, Samuel Ramos, Paul Thompson, Ralph White, and Blake Wingate testified in person. Three additional witnesses testified by deposition: David Breland, Valerie Buehler, and Tyrone Sherrod. Portions of their depositions were included in the record as Plaintiffs' Exhibits ("Pl.Ex.") 13, 14 and 15.

**6.** The detainee witnesses who testified at the February 7, 2000 hearing are Angel Acevedo, Nikolaj Amann, Robert Archer, Andre Greene,

At the May Hearings, this Court heard testimony from 18 present and former detainees in the New York City jails.[5] In addition, 11 prisoners gave testimony concerning environmental health and personal hygiene issues at an earlier hearing, held in February 2000.[6] The plaintiffs also presented testimony from Robert W. Powitz, Ph.D., an expert in the field of environmental health,[7] and called as an adverse witness Tanya Rodriguez Barrows, unit chief for the Mental Health Center on Rikers Island and an employee of St. Barnabas Hospital. The defendants presented the testimony of the Department of Correction's Director of Environmental Health, Patricia Feeney, who also testified as an expert;[8] the Department of Correction's Assistant Commissioner for Assets Management and Support Services, Vincent Cara; and the Department of Design and Construction's Assistant Commissioner who serves the Department of Corrections and the Police Department, Kuo Tsu.

Garrick John, William Jones, Jeffrey Powell, Reinaldo Rodriguez, Luis Roque, Richard Timmons and Keith Todd. Relevant excerpts from the testimony of these witnesses are collected in the present hearing record as Pl.Ex. 16.

**7.** Dr. Powitz testified that he had been qualified as an expert witness for the purpose of testifying on approximately 15 occasions and has inspected more than 30 prisons. (Tr. 425.) Dr. Powitz labors in private practice as a forensic sanitarian and has worked in the field of environmental health since the 1960's. (Tr. 421, Pl.Ex. 100.) Dr. Powitz has published articles in a variety of professional journals and has been certified by numerous state agencies and professional bodies. (Pl.Ex. 100.)

**8.** Patricia Feeney has worked in the environmental health field since the late 1980's and has worked as a public health sanitarian for both the New York City Department of Health and the Department of Corrections. (Tr. 760–61.) Director Feeney is a registered sanitarian in the State of New York. (Tr. 761.)

In addition, both parties presented documentary evidence, which included additional deposition testimony from Commissioner Cara and Director Feeney (Pl.Ex. 369 & 370) and deposition testimony of Roger Slattery, defendants' Assistant Deputy Warden for Administration at AMKC, and responsible for environmental health in the Mental Health Center (Pl.Ex. 17).

The parties engaged in discovery in this case during the latter half of 1999 and through the first four months of 2000. A review of Director Feeney's notes reveals that she conducted joint inspectional tours with the plaintiffs' expert, Dr. Powitz on the following days: November 22, 23, 24, 29 and 30, December 1, 2, 3, 17, 20, and 21, 1999 and March 15, 16, 20, 21, 22, 24, 29, and 30, 2000. Pl.Ex. 365–66. (These notes are mis-dated March 23 at Pl.Ex. 366 E066715.) Common sense supports the proposition that these visits were not unannounced.

The hearing was conducted on an expedited schedule because of the statutory prescription of the PLRA that termination motions be ruled upon "promptly." 18 U.S.C. § 3626(e)(1). Pending this and other hearings on defendants' termination motion, the court by Memorandum and Order of December 17, 1999, suspended the effect of the PLRA's "automatic stay" provision, 18 U.S.C. § 3626(e)(2). Following submissions by both sides (on a timetable agreed upon by both sides and the Court), this matter became subjudice on September 5, 2000.

### B. The Facilities

The fourteen jails under review in this proceeding currently house over 10,000 prisoners. The facilities are the Anna M. Kross Center (AMKC), the Adolescent Reception and Detention Center (ARDC), the George Motchan Detention Center (GMDC), the James A. Thomas Center (JATC), the Rose M. Singer Center (RMSC), the George R. Vierno Center (GRVC), the North Infirmary Command (NIC), and the West Facility (West) on Rikers Island; the Vernon C. Bain Center (VCBC), a "maritime facility" anchored off the Bronx; the Manhattan Detention Center, (MDC), the Queens Detention Center (QHD), the Brooklyn Detention Center (BKHD), and the Bronx Detention Center (BXHD). (The latter three have also been known as the Queens, Brooklyn and Bronx Houses of Detention.) The Correctional Institution for Men (CIFM), referred to occasionally in testimony and documents, holds sentenced misdemeanants and is not at issue in this proceeding.

### C. Standard of Review

The PLRA provides that

> Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3).

As this Court has observed previously, the PLRA authorizes courts to "continue to define the scope of prisoners' constitutional rights, review the factual record, apply the judicially determined constitutional standards to the facts as they are found in the record and determine what relief is necessary to remedy the constitutional violations." *Benjamin v. Jacobson,* 172 F.3d 144, 151–52 (2d Cir.1999) *quoting Benjamin v. Jacobson,* 935 F.Supp. 332, 351 (S.D.N.Y.1996).

In *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court held that

> [prison] conditions ... alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in [*Estelle v. Gamble,* 429 U.S. 97, 103–104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ]. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

■ In this case, however, because the plaintiff class is compromised of pre-trial detainees who have not been found guilty of any crime, they are not subject to punishment. *See Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The *Bell* Court concluded that the conditions of a pre-trial detention facility are properly reviewed under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment. 441 U.S. at 537, n. 16, 99 S.Ct. 1861.

In *Kost v. Kozakiewicz,* the Third Circuit had occasion to consider claims of pretrial detainees alleging inadequate medical treatment and observed that:

> Pretrial detainees ... are entitled to at least as much protection as convicted prisoners, so the protections of the Eighth Amendment would seem to establish a floor of sorts. It appears that no determination has as yet been made regarding how much more protection unconvicted prisoners should receive.

1 F.3d 176, 188, n. 10 (3d Cir.1993); *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (the Due Process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner.")

To make out an Eighth Amendment conditions of confinement claim, "extreme deprivations are required." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To prevail in this litigation, plaintiffs' claims need not rise to such a threshold. The Department of Corrections

> may subject [the plaintiffs] to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.

\* \* \* \* \* \*

Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment.

\* \* \* \* \* \*

■ Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Bell v. Wolfish,* 441 U.S. 520, 535–536, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447.

In *Bell,* the Supreme Court explained that

Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial. We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.

*Bell,* 441 U.S. at 540, 99 S.Ct. 1861 (footnote omitted).

In a footnote, the *Bell* Court cautioned the judiciary to be wary of second-guessing the reasoned decisions of prison administrators:

In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell,* 441 U.S. at 540, n. 23, 99 S.Ct. 1861 (*citing Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)).

The PLRA, which guides the review of the Consent Decrees in this litigation serves to reinforce the notion that prison administrators, not federal judges, are best suited to manage the conditions of confinement.

Defendants argue that the plaintiffs must show deliberate indifference to prevail. The parties agree that deliberate indifference means that a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The parties also agree that the Second Circuit has applied a standard of deliberate indifference to pretrial detainees' constitutional challenges to jail conditions in at least two cases: *Liscio v. Warren,* 901 F.2d 274 (2d Cir.1990) and *Bass v. Jackson,* 790 F.2d 260 (2d Cir.1986). In *Liscio,* the complaint alleged that a doctor and others "were deliberately indifferent to [plaintiff's] serious medical needs while [he] was undergoing drug and alcohol withdrawal as a pretrial detainee ... resulting in serious physical injury." 901 F.2d at 277. In *Bass,* the Circuit was presented with a claim of "failure to protect [ ] from physical harm in violation of [plaintiff's] constitutional rights under the Eighth and Fourteenth Amendments" arising out of an instance of inmate-on-inmate violence in a county correctional facility. The *Bass* court observed that

The Supreme Court has recently made clear that the Due Process Clause is "not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property." *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) (empha-

sis in original). That case explicitly did not consider whether something less than intentional conduct, such as recklessness or gross negligence, is enough to trigger the protections of the Due Process Clause. *Id.,* 106 S.Ct. at 667 n. 3. In the absence of further guidance, we must adhere to our recently restated position that

> [a]n isolated omission to act by a state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him. *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir. 1985) (*quoting Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)).

901 F.2d at 278.

It is worth noting that in adhering to *Ayers,* the *Bass* decision relied on a case that set forth standards applicable to convicted and sentenced state prisoners, who are subject to punishment and protected under the more stringent Eighth Amendment standards. The *Bass* court rejected the appellant's second claim as well, i.e., that he was not afforded prompt medical attention after an incident of violence. The Circuit there applied the deliberate indifference standard set forth in *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.").

Both the *Liscio* and *Bass* decisions appear to have overlooked the standard applicable to pretrial detainees set forth in *Bell v. Wolfish,* i.e. those decisions did not even cite *Bell* nor examine whether the condition challenged was "reasonably related to a legitimate goal." *Bell,* 441 U.S. at 539, 99 S.Ct. 1861. Neither party here mentions this oversight, nor does either party take notice of a more recent decision by the Second Circuit wherein the Circuit acknowledged that

> It remains unsettled ... whether a pretrial detainee must meet the "deliberate indifference" standard of *Estelle* or show "gross negligence" or "recklessness" or prove conduct not amounting to intentional acts, but that is more than simple negligence to state a claim of a constitutional deprivation under the Due Process Clause. *See Daniels,* 474 U.S. at 334 n. 3, 106 S.Ct. at 666 n. 3 (refusing to consider whether "something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause"); *cf. City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1204 n. 8, 103 L.Ed.2d 412 (1989) (noting that question remains unresolved).

*Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

██ Mindful that the requisite standard under the Due Process Clause remains unsettled, I find that the plaintiffs here have met the "deliberate indifference" standard with respect to certain environmental conditions in the Department's prisons. Under that standard, a plaintiff to prevail must satisfy two requirements, consisting of an objective and subjective component in order to find a prison official liable for violating an inmate's right to humane conditions of confinement. The objective component requires that the alleged deprivation be "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). This test is met, for instance, when, as in this case, a claim involves a number of inhumane confinement conditions, and the court finds that, when taken together, these conditions sat-

isfy even the stricter Eighth Amendment standards and that this occurs

> when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.... Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.

*Wilson,* 501 U.S. at 304–05, 111 S.Ct. 2321 (citations omitted).

The subjective component requires the jail official to have a "sufficiently culpable state of mind." *Wilson,* 501 U.S. at 297, 111 S.Ct. 2321. In the context of prison-condition claims, the required state of mind is one of " 'deliberate indifference' to inmate health and safety." 501 U.S. at 302–03, 111 S.Ct. 2321. In other words, a prison official is liable only if he or she "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

The *Farmer* Court noted that "even prison officials who had a subjectively culpable state of mind when the lawsuit was filed could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litiga-

tion." 511 U.S. at 847, n. 9, 114 S.Ct. 1970. And of course, under the Eighth Amendment standard, a district court must take into account "prison officials' 'current attitudes and conduct.' " *Id.* (*quoting Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

In this case, the Consent Decrees have been in place for more than a generation, and accordingly, the *Department, qua* Department cannot demonstrate that it did not have actual knowledge of any conditions which are unconstitutional from an objective standpoint. The deficiencies shown at trial are largely the continuations of deficiencies that have been known, obvious, and commented upon by the Office of Compliance Consultants ("OCC") [9] and plaintiffs' counsel for years, (*see* App. 1, Section T), and that have been the subject of further court orders between the entry of the Consent Decrees and the present proceedings. While past actions that have failed to cure or avert the harm at issue may have appeared reasonable at the time, "patently ineffective gestures purportedly directed towards remedying objectively unconstitutional conditions do not prove a lack of deliberate indifference, they demonstrate it." *Coleman v. Wilson,* 912 F.Supp. 1282, 1319 (E.D.Cal.1995), *appeal dismissed,* 101 F.3d 705, 1996 WL 665551 (9th Cir.1996). In this case, the Court must focus on any continuing and ongoing violations of plaintiffs' constitutional right to adequate shelter and environmental health conditions, and the defendants' good intentions, without more, cannot constitute grounds to terminate the Consent Decrees.

Finally, it should be emphasized at the outset that the review of prison conditions set forth below represents only a snapshot

---

**9.** OCC functions as the Court's independent monitor in this case. OCC was created in 1982 to act as a neutral third party to assist the defendants in achieving compliance with

the Consent Decrees and related orders and to assist the parties in resolving disputes as to compliance problems.

of conditions in the Department's jails. This Court has not been apprised of any changes (for the better or the worse) which may have taken place since the May Hearings. Accordingly, it is incumbent upon the parties to document any changes in conditions when submitting proposed orders recommending prospective relief.

## II. *REVIEW OF CONDITIONS*

### A. *Ventilation*

■ A lack of adequate ventilation in a detention facility can contribute to the transmission of air-borne diseases, a problem which, is magnified for detainees who have compromised immune systems as a result of HIV infection or suffer from asthma or other respiratory ailments. Dr. Powitz, relying on information from New York City Health and Hospitals Corporation, testified that approximately 9,000 asthmatics passed through the New York City jails in 1999. (Tr. 432–33.) Inadequate ventilation also undermines efforts to maintain minimum levels of sanitation within the Department's facilities, providing an environment where mildew, mold, rust, and bacteria can flourish.

In *Hoptowit v. Spellman*, the Ninth Circuit affirmed the finding of the district court which concluded that the lack of adequate ventilation violated the Eighth Amendment. 753 F.2d 779, 783 (9th Cir. 1985). The Tenth Circuit has held that prison officials must provide "reasonably adequate ventilation" to inmates. *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). In *Ramos*, the record indicated that the prison failed to meet the "minimal health and safety needs of the prisoners", in part, because, "[i]nadequate ventilation, especially in the cells and shower areas, results in excessive odors, heat, and humidity with the effect of creating stagnant air as well as excessive

mold and fungus growth, thereby facilitating personal discomfort along with health and sanitation problems." *Id.* at 569. This court found that such conditions were " 'grossly inadequate and constitutionally impermissible.' " 639 F.2d at 570.

Ventilation involves two facets: supply of fresh air and exhaust of impure air. Ventilation may be achieved through either active or passive means. Active ventilation is commonly used in sealed buildings with few apertures, and involves the use of mechanical air delivery and exhaust systems. Passive ventilation relies on the exchange of air through open windows.

The parties disputed how to measure whether a particular area within a jail receives adequate ventilation. Director Feeney testified that the Environmental Protection Agency ("EPA") "would actually recommend that you use carbon dioxide as an indicator to check for ventilation problems and air-quality problems." (Tr. 795.) Director Feeney further testified that according to the EPA and the American Society for Heating, Refrigeration and Air Conditioning Engineers (ASHRAE), carbon dioxide levels between 600 and 1000 parts per million are considered acceptable and a level below 600 parts per million is considered excellent. (Tr. 797.)

Dr. Powitz did not measure the levels of carbon monoxide or carbon dioxide present in the air at the Department's facilities. (Tr. 794.) Instead, Dr. Powitz opined that air quality should be measured by whether the ventilation system removes particulates, aldehydes, and odors from the air. (Tr. 493.) The presence of environmental tobacco smoke, condensate from showers and odors from the prison cells themselves were also relevant to indoor air quality in Dr. Powitz's opinion. (*Id.*) When asked how carbon monoxide and carbon dioxide

was relevant to air quality, Dr. Powitz stated

Carbon dioxide is [relevant] if under crowded conditions we look at the concentration of carbon dioxide in the absence of air movement and people. Carbon monoxide comes from internal combustion sources such as motors, some from environmental tobacco smoke.

(Tr. 494.)

Dr. Powitz testified that the consequences of inadequate ventilation in the Department's facilities are myriad. As noted, poor ventilation can exacerbate asthma and allergies, and allows molds, mildews and bacterial slimes to accumulate fester in shower rooms and restrooms where moisture-laden air is not exchanged and refreshed. (Tr. 547–48.) Lack of ventilation in chronically wet areas can also lead to "profound" deterioration of surfaces including floors, walls, ceilings, and windows. (Tr. 547.)

Dr. Powitz testified that he found the ventilation systems at OBCC, VCBC, West Facility, and MDC to be operational, but explained that the MDC system was not functional. (Tr. 746.) Plaintiffs contend that but for BKHD,[10] QHD, VCBC, and West Facility, each of the ten remaining institutions fails to pass constitutional muster. Problems with respect to adequate ventilation in each of the ten remaining institutions follows:

*AMKC*

The ventilation situation in AMKC presents a mixed picture. Dr. Powitz testified that "maintenance people told us that fully 10 percent of the windows were actually broken." (Tr. 549.) On November 22, 2000, there was no ventilation in C–71, the mental health unit within AMKC because the windows were "inoperable", and thus that area "was rather malodorous." (Tr. 549, 552.) Further, lack of ventilation was also observed in the dorm toilet areas, and in Upper 9 (a mental observation unit) and Lower 1, there was no ventilation at all. (Tr. 549.) Director Feeney noted the following deficiencies with respect to 6 of 16 AMKC housing areas:

Mod 9 A: "Ventilation inoperable" (Pl. Ex. 365 at E06547)

Mod 6 B: "Exhaust registers were very dirty" (*Id.* at E06547)

Upper 9: "Ventilation was poor" (shower area) (*Id.* at E06548)

5 Lower: "Ventilation was not operable" (*Id.* at E06548)

Lower 1 *and* Lower 3: "Ventilation was inoperable throughout both houses."

(*Id.* at E06550.)

Director Feeney's report of April 10, 2000 reflects that "Four exhaust fans were installed in AMKC for Lower 1 and 3" and that "[t]he Supervisor of Mechanics estimates that the wiring will be completed by the middle of May [2000] for these units." (Defendants' Exhibit ("Def.Ex.") F–1 at 6.) Commissioner Cara testified that he was only aware of ventilation problems in Lower 1 and 3, part of the Mental Health Center. (Pl.Ex. 370 at 352)

This description of the ventilation system at AMKC does not support the plaintiffs' contention that the majority of detainees are subjected to conditions of inadequate ventilation. The evidence does not show inadequate ventilation in the residential areas of AMKC, however it is clear that the Department does not provide adequate ventilation in C–71 and Upper 9. For this reason, the Court will

10. Dr. Powitz testified that "probably Brooklyn had the best ventilation of most of them and we did find some occluded grills, but not to the extent we found in many of the other buildings." (Tr. 558.)

enter an order directing the Department to take immediate remedial measures with respect to ventilation in the mental observations units of AMKC.

### ARDC

According to Director Feeney's notes taken during tours of ARDC in November of 1999:

Ventilation was inoperable throughout the entire building. The Supervisor of Mechanics stated that a ventilation project was underway in the facility and more than 20% of the areas were restored. However, ventilation was not provided in any area inspected and the Supervisor of Mechanics was not able to inform Dr. Powitz of the areas that were already restored.

(Pl.Ex. 365 at E06554.)

Moreover, the exhaust registers in the Intake/New Admission areas were noted as "dirty throughout." (*Id.* at E06557.) A minority of the ventilation registers in the cells inspected were observed to be "dirty" or "excessively dirty." (*Id.* at E06556, E06561, E06566, E06567, E06571, E06572.) However, at her deposition on April 13, 2000, Director Feeney testified that 75% of the exhaust units at ARDC had been repaired since November 1999. (Def. Ex. X–7 at 377.)

Additionally, Dr. Powitz testified that the beds in Modular 10 were placed head-to-head, rather than six feet apart which is required to minimize disease transmission. (Tr. 690.) Dr. Powitz explained that droplets emanating from one person's mouth remain airborne for at least three feet, but that most will not travel as many as six feet, which is why the beds should be placed that far apart. (Tr. 690–91.)

### BXHD

Dr. Powitz testified that BXHD relies on an active ventilation system as well as air from windows, which are located across a catwalk from the prisoners and although barred, are inaccessible to the prisoners. (Tr. 557.) (Pl. Mem. at 17.) Further, Dr. Powitz explained that "many of the window controls were either missing or broken and that [a] request had been in for window replacement." (Tr. 557–58.) He found "very few windows in any cellblock ... that could be open for cross ventilation." (Tr. 558.) Defendants' smoke tests of certain areas of BXHD indicated that there was no exhaust in two of five cell areas tested on the fifth floor and that there was non-detectable exhaust in two areas of the third floor. (Def.Ex. F–10.) However, defendants point out that the carbon dioxide levels of all of the areas tested at BXHD were below 600 parts per million, and thus argue that air quality is excellent under prevailing EPA and ASHRAE standards. (Def. Mem. at 21.)

On these facts, I find no current and ongoing violation with respect to adequate ventilation at BXHD.

### GMDC

The notes taken by Dr. Powitz regarding his fall 1999 visit to GMDC indicate that there were ventilation problems in almost every housing area inspected. (Pl. Ex. 106 at P84–P128.) Director Feeney's report states that "numerous ventilation units were inoperable at the facility" but that as of April 10, 2000, "sixty percent of the exhaust units were repaired by service contracts." (Def. Ex. F–1 at 18.) Plaintiffs draw the inference that forty percent of the ventilation thus remains inoperable at GMDC. (Pl. Mem. at 17.) Commissioner Cara testified at his deposition that he was unaware of the status of any efforts at GMDC with respect to ventilation. (Pl.Ex. 370 at 356–357) ("I haven't been asked for assistance on it so I don't know.")

On this record, I cannot help but conclude that inadequate ventilation at GMDC

constitutes a current and ongoing violation of federal law.

### GRVC

The notes taken by Director Feeney during her fall 1999 inspection of GRVC indicate that ventilation registers were inoperable in a significant minority of cells surveyed. (*See* Pl.Ex. 365 at E06628 to E06644.) Additionally, a minority of cell exhaust registers were dirty and a minority were clogged with paper or otherwise rendered inoperable by detainees. (*See id.*) Air flow readings taken by Dr. Powitz with a velometer in a number of GRVC's buildings indicated that the ventilation system was operable. (Def. Ex. F–1 at 24.).

Detainee witness Keith Todd testified that during the fall of 1999 in GRVC's "5 Block", the heat was turned up in the cell housing area until his throat and nose dried up. He indicated that there was a window in the cell, but that no air is circulating if you have the door closed. The door was locked whenever it was lock in time, which included every day from "quarter to eleven at night until about 8:30 the next morning." (Pl.Ex. 16 at 135–136.)

Detainee witness Ralph White reported that he was housed in a cell area in 6B, which was very hot and humid. He testified that "there is ventilation but the only ventilation is the windows which the screens are murky so there is no ventilation really coming in or going out." (Tr. 249.)

Detainee witness Blake Wingate was housed in GRVC in the summer of 1999. He described GRVC as "a new building and like this courtroom is air conditioned GRVC is supposed to be air conditioned. But the officers turn the air conditioner on in their bubble cube and they don't turn it on for us[.]" (Tr. 334.) He went on to explain that there was no ventilation, because "when the air is off, that is it. And GRVC—it was built as a central air unit

facility. . . . if they didn't turn the units on we had it bad in there." (Tr. 334.)

Finally, detainee witness Robert DeRosario testified that the ventilation within GRVC was adequate. (Tr. 203.)

The record reveals a mixed picture with regard to ventilation at GRVC and is sufficient to support a finding that there is a continuing violation of federal law which must be remedied by an order that directs the Department to implement at the GRVC facility appropriate practices and procedures designed to maintain a functioning ventilation system.

### JATC

In a report on environmental health at Department facilities, dated April 10, 2000 (the "April Report"), Director Feeney writes that "[t]he ventilation was operable in all areas." (Def. Ex. F–1 at 20.) However, Director Feeney's notes indicated that during the fall of 1999, ventilation and exhaust registers were dusty, dirty, or clogged in fifteen of twenty-five cells surveyed. (*See* Pl.Ex. E06604—E06607.) The defendants did not present a ventilation survey of the carbon monoxide or carbon dioxide levels in JATC and the April Report does not discuss whether the compromised ventilation and exhaust registers had been cleaned and unclogged. This record is sufficient to sustain a finding that ventilation is constitutionally inadequate in JATC.

### MDC

MDC is a "closed jail" that depends on a mechanical ventilation system in which the "supply air is provided through a forced air duct system." (Pl.Ex. 370 at 179.) Dr. Powitz testified that while the ventilation system was largely operational, he found that vents had been plugged so that the system could not function. (Tr. 557.) He testified that "good housekeeping practices

of unplugging the exhaust grills and insuring that the intake is free of debris and being plugged would make that building quite functional." (*Id.*) Director Feeney's notes reveal that 44 of 63 ventilation registers or exhaust vents in cells and showers were clogged or dirty during a visit to MDC. *See* Pl.App. 2 at 5, citing Pl.Ex. 366 at E06659 to E06670. This figure does not include the additional number of ventilation registers that Dr. Powitz believed were inoperable because he could not detect airflow across his hand. Defendant's report of an environmental survey of air quality at MDC conducted on April 24, 2000 indicates that exhaust ventilation could not be detected by smoke test tubes tested in any occupied cells, day rooms or showers. (Def. Ex. F–10 at E12885.) This uncontradicted record is sufficient to sustain a finding that ventilation is constitutionally inadequate in MDC.

### NIC

When the temperatures are moderate, there is good cross ventilation in the old building at NIC due to numerous operable windows. (*See* Def. Ex. F–10 at E12888.) However, Dr. Powitz found very little operational mechanical ventilation at NIC. (Tr. 559–560; Pl.Ex. 106 at P253–256.) In colder weather, Dr. Powitz testified ventilation would thus be inadequate. (Tr. 560.)

Detainee Richard Fischetti described being housed in Dorms 2A and 2B in the infirmary where there was no ventilation. He reported no ventilation in the bathroom area of 2A where he observed paint chips coming off the wall, tiles coming up and mold. (Tr. 113–114.) Mr. Fischetti also described being in a punitive segregation cell in the back of Dorm 3 in the Annex, were there was no ventilation in the cell for two weeks. He described the cell as "muggy, stuffy no ventilation whatsoever." (Tr. 114–15.)

Detainee Robert DeRosario testified that the window in the bathroom of 5 south is "covered with a sheet of plexiglass that is screwed in because apparently the window is broken in the open position so I guess in the winter it must have been quite cold so they covered it, but because of the warm weather now it's making it quite hot." He explained that because there is no functioning vent (he tested it with cigarette smoke), when plumbing breaks, the odor from stopped up toilets is a problem. (Tr. 200–01.)

Defendant's report of an environmental survey of air quality at MDC conducted on April 20, 2000 indicates that exhaust ventilation could not be detected by smoke test tubes tested in any of the 11 tested residential and intake areas. (Def. Ex. F–10 at E12887—E12888.) However, the shower which was tested was adequately ventilated. (*Id.* at E12888.) This record is sufficient to sustain a finding that ventilation is constitutionally inadequate in NIC.

### OBCC

Director Feeney's notes of a March 22, 2000 survey of OBCC indicate problems with ventilation in six of the ten housing areas inspected at OBCC. Specifically, in 5 South, exhaust registers were clogged in 3 of 7 cells, though another cell had an open window for ventilation. (Pl.Ex. 366 at E06717A—E06718.) In 4SW, the vents were clogged in one shower and no exhaust was provided in another. (*Id.* at E06718-9.) In 2South, there was no vent in the upper shower. (*Id.* at E06721.) In 5N/Annex, the exhaust was dirty in 2 of 8 cells surveyed, the exhaust register was clogged in 2 of 8 cells. (*Id.* at E06723-4.) However, 2 of the 8 cells had opened windows. In 6 Lower, a smoke tube test revealed that the air supply was not operable and that the exhaust was not open. (*Id.* at E06733.) Finally, in 6 Upper, the exhaust was inoperable in the shower area.

(*Id.* at E06733.) A Departmental environmental review of ventilation in the OBCC dormitory sleeping areas indicated that the air supply and exhaust systems were inoperable in the sleeping areas surveyed by means of a smoke tube test conducted on April 25, 2000. (Def. Ex. F–10 at E12890–1.)

Detainee Richard Johnson testified that there was no discernable air circulating in his dormitory housing area: "For some reason there is no air. It is just stagnant." (Tr. 282.)

This record is sufficient to sustain a finding that ventilation is constitutionally inadequate in OBCC.

### RMSC

Detainee witness Mary Johnson described generators at the back of Dorm 20 that gave off diesel fuel fumes. She testified that there is no ventilation in the Dorm except for the windows and if you open the windows the ·room fills with fumes. The fumes "caused a lot of asthma attacks, a lot of seizures and my myself, I have angina and high blood pressure. It caused my pressure to rise very high." (Tr. 236–37.)

Detainee witness Wonder Fields described the vents in Dorm 17, both those on the walls and those on the ceiling as filthy. "They are black and nasty. They are dirty and need to be cleaned.... You see lint and all type of cluttered stuff inside them." (Tr. 396.) She reports that the wall vents were cleaned a week before the hearing for the first time since she had been in the dorm. She moved to Dorm 17 in early October (7 months earlier). (Tr. 393.) The ceiling vents had still not been cleaned. (Tr. 396.) She also reported that there was no ventilation in the bathroom: "[t]here is no way for the steam to go but to move out toward the bed area." (Tr. 400.)

Detainee witness Valerie Buehler explained that there is absolutely no ventilation in the Sprung, because the windows can't open and there is constant hot air blowing in. She stated that it is very hard for people with respiratory problems to breathe. (Pl.Ex.14 at 13.) She has asthma, sinusitis and a history of pneumonia and upper respiratory infections. (*Id.* at 14.)

An April 5, 2000 survey of the Rose M. Singer Center found no or non-detectable exhaust ventilation in 21 of the 43 locations surveyed in the intake area of RMSC, including non-detectable ventilation in the two medical treatment rooms and the examination room. (Def. Ex. F–11 at E12894–95.)

Dr. Powitz testified that there was "variable ventilation" at RMSC. (Tr. 558–59.) Dr. Powitz found problems with ventilation in only five of 14 housing areas at RMSC. (Def. Br. at 19, citing Pl.Ex. 6 at P000264–P0000278.) On these facts, I find that RMSC's lack of ventilation is constitutionally deficient.

In summary, the Court determines that there is a continuing and ongoing violation of the basic right to adequate ventilation in ARDC, GMDC, GRVC, JATC, MDC, NIC, OBCC, and the mental observations units at AMKC, and the intake areas at RMSC. The parties are directed to submit proposed orders with recommendations including (where appropriate) timetables for prospective relief governing ventilation in these facilities within 30 days from the date of this opinion.

### B. Air Temperature

■ In *Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) the Supreme Court defined "warmth" as an "identifiable human need," the deprivation of which may constitute an Eighth Amendment violation. Such a de-

privation would doubtlessly violate the Due Process standard applicable to pretrial detainees.

Extremes of temperature present health risks as well as discomfort. Director Feeney testified that lack of heat for an extended period can disrupt sleep patterns, "make someone more susceptible to disease," and "can be stressful." (Pl.Ex. 369 at 69.) Dr. Powitz testified that the human comfort zone is a range of temperatures between 67 and 78 degrees Fahrenheit, but that because detainees are for the most part sedentary, their general comfort zone is between 72 and 78 degrees F. (Tr. 489.) Exposure to temperatures much below that cause the body to feel chilled. (*Id.*) Excessive heat, too, can be dangerous. For people on psychotropic medications, "when it starts to get in the 80's, mid-80's or so they start having problems." (Tr. 588, Testimony of Dr. Powitz). According to Director Feeney, extremely hot conditions affect the ability of people on psychotropic medication to regulate their own body temperatures, (Tr. 780), and can lead to heat exhaustion or heat stroke. In addition, Dr. Powitz explained that people with respiratory problems can become more symptomatic as the temperature gets higher. (Tr. 588.)

The Department of Correction has adopted the minimum standards established in the New York City Health Code:

> Pursuant to section 131.03 of the N.Y.C. Health Code, heat shall be supplied to every occupied portion of a building. During the months between October 1st and May 31st between the 0600 and 2200 hours, a temperature of at least 68 degrees F. when the outside temperature falls below 55 degrees F. and during the period of 2200 and 0600, a temperature of at least 55 degrees F. shall be maintained if the outside temperature falls below 40 degrees F.

Def. Ex. F–20 at E07051.

The credible evidence tends to show that air temperatures in the Department's jails did not meet constitutional standards. Prolonged exposure to cold temperatures poses a direct risk to the health of detainees and is not reasonably related to any legitimate Departmental interest. *Bell v. Wolfish*, 441 U.S. at 538, 99 S.Ct. 1861.

Dr. Powitz identified what he claimed to be serious problems with temperatures in six of the fourteen jails he toured. Director Feeney took issue with Dr. Powitz's methodology, pointing out that he relied on radiant temperatures, which measure the temperature of some surface in a room, rather than ambient temperatures, which measure the actual air temperature and is thus a more reliable indicator of comfort. (Tr. 783.) Indeed, Dr. Powitz acknowledged that radiant temperature readings are relevant only insofar as they are used to gauge ambient temperature. (Tr. 566–67; Tr.1068).[11] Defendants argue that Dr. Powitz's own measurements "demonstrate the unreliability of using radiant temperatures—or at least the radiant temperatures that he measured—for determining ambient temperature. On the occasions when Dr. Powitz took both measurements, or when Department staff took ambient temperatures where Dr. Powitz took radiant temperatures, the difference between the two was usually at least 14˜F, a significant difference in terms of comfort levels." (Def. Mem. at 52–53.) For example, when Dr. Powitz measured a radiant reading of 47˜F in one cell, the ambient temperature reading was actually 62˜F, and where he obtained a radiant temperature reading of 56˜F for cell 5 at the GMDC infirmary, he

---

**11.** The New York City Health Code, Department Directive 3900 (Def.Ex. F–20), the ACA (Pl.Ex. 101), and the APHA (Pl.Ex. 102) also refer to ambient temperature standards.

obtained an ambient temperature of 70˜F for the very same cell. (Pl.Ex. 106 at P00098–99; T1007–08.)

The plaintiffs point out that Dr. Powitz generally did not tour on the coldest days of winter, and was not able to tour in summer weather at all. His tours, conducted between November 22, 1999 and December 21, 1999 and between March 15, 2000 and March 30, 2000, mostly took place on moderate days, with temperatures reaching into the sixties; not the coldest days of this winter.[12] In fact, during the nineteen days on which he toured the jails, there were only four days (November 30, 1999 through December 2, 1999 and December 17, 1999) when the average temperature for the day fell below forty degrees. (Pl.Ex. 301) (listing average temperatures for the tour dates). By contrast, there were a total of 57 days between November, 1999 through March, 2000 when the average temperature dropped below 40 degrees. Pl.Ex. 301. On those four cold days he toured GMDC (November 30, 1999 through December 2, 1999) (Pl.Ex. 106 at P00074, 98, 121 (indicating date and facility inspected)), JATC (December 2, 1999) (Pl.Ex. 106 at P00130), and Brooklyn House of Detention (December 17, 1999) (Pl.Ex. 106 at P00154).

(Pl. Mem. at 31–32) (footnote omitted).

Moreover, Dr. Powitz did not have the opportunity to tour the jails during the summer months, and thus as plaintiffs acknowledge, Dr. Powitz "had little opportunity to observe the jails' abilities to respond to extreme heat conditions." (Pl. Mem. at 32.)

The plaintiffs' expert observed heat deficiencies in the minority of the facilities which he surveyed, and the temperature extremes observed were, for the most part, not facility-wide, but limited to a particular cell or housing area. (*See* Pl. Mem. at 32–35) (cataloguing deficiencies in ARDC, GMDC, JATC, NIC, OBCC, and RMSC.)

Detainee testimony helps to fill in some of the gaps in Dr. Powitz's account. A review of that testimony reveals the following:

*AMKC*

Two detainees reported that they could see their breath in the freezing air in the fall of 1999. (Pl.Ex. 16 at 510–11, Pl.Ex. 16 at 194–95.) Two different detainees reported "very cold" temperatures in housing areas during the fall of 1999; one reported extreme heat in C–71 during February 2000; and yet another reported extreme heat during the summer of 1999.

*ARDC*

The testimony of the seven detainees who reported on temperature extremes at ARDC can be summarized as follows: the temperature was either too hot or too cold in the winter months. (Pl.App. 6 at 1–2.) Detainee Breeland described no heat at all for a three day period in the fall of 1999, followed by a transfer to another unheated housing area for 3–7 days. (Pl.Ex.–13 at 5, 17.) Detainees Breeland and Wingate both testified to the occurrence of food strikes by detainees which were designed to call the warden's attention to the extreme cold. (Pl.App. 6 at 2.) The entirety of the detainee testimony concerning ARDC suggests that when one part of a of a cell block is heated, another part of that

---

**12.** A review of Director Feeney's notes reveals that tours were conducted on the following days: November 22, 23, 24, 29 and 30, December 1, 2, 3, 17, 20, and 21, 1999 and March 15, 16, 20, 21, 22, 24, 29, and 30, 2000. Pl.Ex. 365–66. (These notes are misdated March 23 at Pl.Ex. 366 E066715.)

block will grow far too hot, while yet another will remain cold. (*Id.*) Detainees did not testify to the existence of temperature extremes during the summer months. (*Id.*)

### BKHD

During the summer months, a detainees embarked upon a food strike in order to get a fan, which was provided after 6 weeks, according to Robert Jones. (Pl. App. at 3.) Three detainees including Jones described exceedingly cold winter temperatures. One detainee reported being able to see his breath and another testified that a cup of water would freeze if left on the floor of a cell on the lower tier.

### BXHD

Detainee Sherrod testified that a cold cellblock was temporarily remedied by a captain who instructed corrections officers to provide the men with a second blanket. (Pl.Ex. 15 at 15–17.)

### GMDC

Five detainees testified to an exceedingly brutal picture of life in GMDC: detainees testified that even corrections officers kept winter coats on indoors, detainees huddled in blankets in the day room, extra blankets were not available for all detainees, detainees could see their breath, and detainees would try to seal unsealed windows themselves with any plastic they could find. (Tr. 73–74, 93, 110, 112, 136–7, 206–210; Pl.Ex. 16 at 359, 364–66.)

### GRVC

The testimony of eight detainees who were housed in GRVC revealed that detainees were subjected to either extremely hot or extremely cold temperatures, sometimes for more than a week at a time, in the colder months. (Pl.App. at 4–5.) The summer temperatures within the facility were so unbearable that one detainee told of officers who permitted water fights to alleviate the extreme discomfort. (Pl.Ex. 16 at 196.)

### JATC

The testimony of four detainees from JATC paints a somewhat less extreme picture. Nonetheless testimony revealed that in the summer, JATC was uncomfortable and in the wintertime, uneven heating in the facility left those in the rear of the facility "freezing cold." (Pl.Ex. 16 at 540.) Detainee Jones testified that "you could see your breath." (Pl.Ex. 16 at 88.) Requests for extra blankets were "usually" met with the response that "there wasn't one available" so that detainees would "wait until somebody moved out and take it from the person [who] was leaving." (*Id.*)

### NIC

The testimony of three detainees who had been housed in NIC paints a sorry picture. Detainee Robert Jones was housed in Dorm 3 in January and February, 2000. He testified that the windows didn't close, that there was plastic covering them and that it was so cold every night that he could see his breath inside and wore his heavy coat under the blankets to sleep. He described that on windy days the plastic would blow off the windows. He testified that he made his complaints known to housing area officers. (Tr. 163–64.)

Robert DeRosario was also housed in Dorm 3 in late December 1999 and all of January 2000. (Tr. 197, 203) (he moved from Dorm 3 on February 2). He said that it was "freezing" and he could see his breath. "Water and snow would come in through the broken windows and freeze right there on the window sill." He went on to explain that "[t]here were at least 15, 20 leaks coming from the ceiling on a daily basis, snow and rain. At least 10 or 15 broken windows where rain would come through. At night 3 blankets weren't even

enough, that is how freezing it was in there. The COs used to walk around with their blue parkas they wear with a blanket around them." (Tr. 197–98.)

### OBCC

The testimony of three detainees who were housed in OBCC revealed that temperature extremes were experienced by detainees in the winter months. Specifically, detainee Alexander Gregory testified that it got so cold that the prisoners called the Inspector General's Office and that someone came to take temperatures and then sent staff to fix the heat. The heat worked for a few days and then it was freezing again. He reports that he was then taken to the intake area of the jail to warm up, but that as soon as he was warm, he was returned to the cold cell. Thereafter, extra blankets were provided. (Tr. 180–81.) On cross-examination, he admitted that the officers let the inmates decide whether or not they wanted to be transferred to another location and the majority of the inmates decided to stay. (Tr. 187.)

Detainee Dorian Miles testified that "people in the house wore extra clothes. Some people wore coats, hats just to walk around the house." He testified that people complained, but that the situation was never remedied. (Tr. 316.)

### OHD

Detainees confined in Queens House of Detention testified that air temperature within the facility was often uncomfortable during extreme hot or cold weather. The testimony of the detainees included accounts of sleeping on the floor during extremely hot weather to keep cold and being denied extra blankets in extremely cold temperatures and having to wait for another detainee to leave in order to access an extra blanket in the wintertime. (Pl.Ex. 16 at 417–18; Tr. 126–27.) Detainee Wingate testified that "sometimes it's so cold you couldn't sleep" (Tr. 329.)

### RMSC

Female detainees housed in RMSC fared no better. Four of them testified that they were exposed to excessively hot and cold temperatures. Detainee Mary Johnson testified she had to wear her jacket in the Dormitory 17 at times to cope with the cold temperatures. (Tr. 243.) Detainee Fields testified that she was issued a sheet but not a blanket upon admission to Building One on September 29, 1999, and that for one week, she could not get warm even though she slept in her clothes. (Tr. 391.) Fields testified that in the modular units, icicles formed on the inside of the windows and that she wore a full set of long johns, a sweat suit, a coat, and three or four pairs of socks. (Tr. 394.) She also testified that during the wintertime in Dorm 17, heat was unavailable intermittently. (Tr. 393, 405.) According to Fields, when the women in her dormitory requested extra blankets, the facility provided one extra blanket to each woman, and when she requested more blankets, she was told that "[t]hey [did not] have any more." (Tr. 394.) With respect to summer temperatures, Fields testified that the dormitory was extremely hot for 4 or 5 days. She reported that a captain took the temperature and stated that the dorm was above 90 degrees. She testified that "Captain Jones told us when it got real hot about four days ago, they couldn't turn the heat off. Then we were told that they were working on the air conditioning but the air conditioning never came up and the heat never went off." (Tr. 395.)

The defendants did not elicit detainee testimony that contradicts the witness testimony set forth above. Nor did the defendants attempt to discredit the testimony on cross examination, except to question whether the detainees' estimates of the actual temperature were based on

a verifiable measurements.[13] The record established with regard to extreme temperatures is thus essentially uncontradicted.

The fact that the Department's environmental survey, conducted on March 30, April 24 and 25, 2000 reports temperature well within the comfort zone of indoor temperatures does nothing to assuage my concerns that detainees are being subjected to constitutionally indefensible air temperatures. The survey was conducted on days when the outside temperature was moderate, so it is unsurprising that the readings corresponded.

Finally a review of the Department's maintenance records submitted into evidence shows numerous references to reports of no heat in Department facilities. While the Department's records show that in the majority of cases, heat was restored within twenty-four hours, in a significant number of instances, there is an indication that work was not completed for days on end thereafter. (*See* Def. Ex. C–6, C–7 *passim* ).

In her testimony, Director Feeney described the Department's approach to identifying and monitoring temperatures in the jails. First, while her Unit responds to complaints, there is no mechanism for detainees to relay their complaints to Director Feeney's Unit. Detainees complain to guards, but there is no system that assures a report of extreme temperatures will ever reach her Unit. (Tr. 929–30.)[14] Second,

beginning last summer "in the summer months when the temperature outside is going to be around 90 degrees the sanitarians monitor the temperatures in the mental health areas and the clinics on Rikers Island." (Tr. 779.) (Feeney); (Pl.Ex. 369 at 93) (explaining that the practice of checking these areas on extremely hot days began last summer). Third, "on very cold days with high wind loads we will check areas where we historically had temperature problems to just see that the temperature is acceptable." (Tr. 780.) Additionally, between May and August 1999, the Environmental Health Unit took 853 separate temperature measurements (and an additional seven on a hot day that March). (*See* Pl.Ex. 300.) These measurements yielded readings in the high 80 degree and 90 degree range, corroborating detainee witness accounts of merciless summertime temperatures. (see, e.g., Pl.Ex. 300 at E01072, E01081.)

As I noted earlier, the Supreme Court in *Wilson v. Seiter* observed that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as . . . warmth . . . for example, a low cell temperature at night combined with a failure to issue blankets." 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

**13.** The defendants did however question the credibility of all detainee witnesses with regard to temperature in their brief, especially the testimony of detainees housed in mental observation units.

**14.** The following exchange occurred during cross-examination of Director Feeney:
PLAINTIFFS' COUNSEL: And the jail should report a condition of 98 degrees in one of its housing units to you as an unusual event, correct?
DIRECTOR FEENEY: Not necessarily?
PLAINTIFFS' COUNSEL: No?
DIRECTOR FEENEY: No.
PLAINTIFFS' COUNSEL: That is not part of the reporting system?
DIRECTOR FEENEY: No.

On the facts set forth above, this Court finds that the defendants have violated the plaintiffs' constitutional right to warmth in AMKC, ARDC, BKHD, GMDC, GRVC, JATC, NIC, QHD, OBCC, and RMSC. The Court also finds that plaintiffs in AMKC, BKHD, GRVC, QHD, and RMSC were subjected to excessively high air temperatures which constituted a direct threat to their health and safety. I note too that defendants have testified that the Department plans to have a number of improvements in place by this winter's heating season. (Tr. 1125–1127.) Accordingly, OCC is directed to monitor the temperature at the above listed facilities this winter and again in the summer season to determine whether continuing and ongoing relief is warranted or whether the risk to human health has been abated. A comprehensive plan is to be worked out between the parties so that the monitoring may begin promptly and in no event more than 30 days from the date hereof.

## C. Plumbing

█ It is self-evident that access to adequate and functional plumbing is essential to a healthy jail environment because of the importance of water for drinking, personal hygiene, laundry, kitchen use, and housekeeping. (Tr. 576–77.) As the plaintiffs point out, "[e]ither cold water or excessively hot water will discourage prisoners from taking showers (and in the latter case, affirmatively prevent them), resulting in an increased risk of skin problems and transmission of disease from person to person, T596–97; Pl.Ex. 369 at 72–73 [15] and, says common sense, a foul and malodorous environment." (Pl. Mem. at 45–46.) Not surprisingly, Dr. Powitz testified that hot water is essential for effective bathing and for handwashing,[16] which is essential for personal cleanliness and public health. (Tr. 582–84.) These considerations are recognized by relevant correctional health standards as well as by the trial witnesses.[17] Lack of hot water also impairs prisoners' ability to clean their clothing. According to Dr. Powitz, "any soap has a melt temperature and it does take hot water to melt the soap or detergent and hot water basically makes water wetter in the presence of a surfactant.... [H]ot water is necessary for clothes wash-

**15.** Director Feeney testified that the public health consequence of people not being able to take showers is "if you live with someone who doesn't wash, it's a malodorous kind of situation to be in and any bacteria or organisms remain your skin if you don't wash them off....if a person has feces someplace on them and they're not showering, then the fecal oral contamination remains on their body, even if their [sic] washing their hands properly." (Pl.Ex. 369 at 73–74.) She identified several organisms that can remain, including lice and mites which "just jump from one body to another," *id.* at 74:6, and ticks, for which "showering obviously is important so they don't go into you." *Id.* at 74:12–14.

**16.** Director Feeney testified that "soap lathers better in warm water than cold water...." Pl.Ex. 369 at 72.

**17.** The applicable American Public Health Association ("APHA") standards require ade-

quate and suitable bathing facilities because they are "essential to the maintenance of health and to prevent the spread of disease." For this purpose, showers must provide tempered water no hotter than 120°F. (Pl.Ex. 102 at 86.) Sanitary facilities must be in "adequate number ... properly connected, operating and maintained." *Id.* The American Correctional Association standards also call for showers with water at 100 to 120 F̄ "to ensure the safety of inmates and to promote hygienic practices." (Pl.Ex. 101 at 45.) The New York City Board of Correction Minimum Standards call for showers with hot and cold water to be made available daily. (Pl.Ex. 310 at 3 (Sec.1–04(b))). The standards are in agreement that a minimum of one shower per eight prisoners should be provided. (Pl.Ex. 102 at 86; Pl.Ex. 101 at 45; Pl.Ex. 310 at 6 (Sec.105(c)(3))).

ing unless the detergent or the soap is [designed] for cold water washing." (Tr. 597.)

While plumbing facilities in the Department's jails leaves much to be desired, their condition does not reach constitutional dimensions. The notes taken by Dr. Powitz and Director Feeney during their survey of Department plumbing found numerous inoperable sinks, toilets, and showers, as well as shower fixtures that provided water that was either too cold or would cause scalding, yet the majority of the Department's plumbing fixtures were operable. The plaintiffs argue that the degree of force required for a detainee to operate the pushbutton controls on some of the plumbing fixtures is excessive in some cases. (Pl. Mem. at 54–57.) However, as defendants point out, not a single detainee witness testified that excessive force was required to operate the pushbutton sinks. Moreover, the problem of missing vacuum breakers on back-flow prevention devices (preventing the contamination of potable water) constitutes a general violation, not a critical violation, of section 10–C of the New York City Health Code and is a situation that is routinely rectified by the Department. (Tr. 806–807.)

The defendants cite both Dr. Powitz's notes, and the plaintiffs' summary of Director Feeney's notations of plumbing deficiencies set forth in Appendix 11 [18] to show that

Half the fixtures or more are available in 80% (57 of 71) of the cases where Powitz noted deficiencies in locations with multiple fixtures, and many of those noted deficiencies are not serious, such as running sinks or leaking flushometers. Moreover, at least 70% of the urinals, sinks, and toilets that Powitz observed in areas with nonfunctional fixtures were functioning, and approximately 65% of the showers worked.[19] (Pl.Ex. 106, 107 *passim.*)

(Def. Mem. at 58–59) (footnote omitted).

The plaintiffs do not dispute this observation. The defendants have also pointed out that "Appendix 11 documents only 1.3 instances of excessive hot water and 2.8 instances of insufficient hot water on average per facility." (Def. Mem. at 60.) While the plaintiffs have not disputed these figures, they argue that one instance of inappropriate water temperature in a given housing area implies excessively hot or cold water in other parts of a facility, because a plumbing system is interconnected and networks through a facility from a common source. (*See* Pl. Rep. Mem. 17.) However, this is merely a hypothetical and fails to convince me that the Department's plumbing problems are so widespread as to constitute a continuing and ongoing violation of federal law. Clearly, in some of the institutions the plumbing is deplorable, but one must keep in mind that we are dealing with prisons juxtaposed with the tests set out in the applicable caselaw.

### D. Vermin

In *Hoptowit v. Spellman,* the Ninth Circuit observed that "vermin infestation

18. Appendix 11 to the Plaintiffs' Brief catalogues Director Feeney's observations regarding plumbing in the Department's facilities and is based upon Director Feeney's notes taken during inspection tours conducted with Dr. Powitz between November 22, 1999 and December 21, 1999 and between March 15, 2000 and March 30, 2000. (*See* Pl.Ex. 365, 366 *passim* ).

19. This statistic is conservative, because Powitz did not note areas where all the fixtures were functioning. The proportion of working fixtures throughout any facility or throughout the Department as a whole is therefore significantly higher.

throughout the prison ... is inconsistent with the adequate sanitation required by the Eighth Amendment." 753 F.2d 779, 783 (9th Cir.1985). The court noted that "[t]he health hazard caused by vermin at the penitentiary is exacerbated by the plumbing and ventilation inadequacies. Such vermin infestation, properly considered in the light of unsanitary conditions such as standing water, flooded toilets and sinks, and dank air, is an unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* As the plaintiffs point out

> Vermin carry disease. They destroy food and contaminate it with their feces and saliva. Their secretions are malodorous, and their saliva and hairs and certain body parts or feces may evoke allergic reactions and exacerbate asthmatic conditions.

(Pl. Mem. at 5–6.) It bears repeating that 9,000 asthmatics passed through the New York City jails in 1999. (Tr. 432–33).

It is important to distinguish between "vermin activity" and "vermin infestation." Director Feeney testified that not every sighting of a pest qualifies as an infestation. (Tr. 855.) Dr. Powitz acknowledged that vermin activity may not be defined as infestation unless all stages of growth of the organism are present. (Tr. 434.)

Defendants admit that "vermin are present to varying degrees in all jails," but argue that the record shows that "most of the Department's facilities have no significant vermin problem, including the West Facility, OBCC, NIC, VCBC, MDC, RMSC, JATC, GMDC, and the Bronx and Queens Detention Complexes." (Def. Mem. at 63.) But for non-residential infestation of a comparatively minor nature, the record supports this contention. However, a significant vermin problem remains at AMKC, ARDC, BKHD, and GRVC. This is confirmed by a review of Director

Feeney's notes of her survey of these facilities. In AMKC, roach and fly infestations were noted in housing areas, showers, and food preparation areas. (*See* Pl.Ex. 365 at E06543–44.) Regarding ARDC, Dr. Powitz testified that kitchen and food storage areas were vermin infested, (Tr. 435) and Director Feeney's notes indicate that the food storehouse was roach and mice infested and the dishwasher room was roach infested. (Pl.Ex. 365 at E06560–1.) Director Feeney's notes with respect to BKHD indicate that the pantries were roach infested, but not the housing areas. (Pl.Ex. 365 at E06620–7.) At GMDC, severe mice and insect infestation was observed in food storage areas and the kitchen. (Pl.App. 1 at 8–9.) Director Feeney's notes confirm that mice and insects roamed the housing areas, including dorms, cells and showers. (*Id.*) Concerning GRVC, Director Feeney's report states that "Active roach nests were observed in the Intake Pantry, cells in Building 1A, Building 1A Pantry and the Laundry. Flies and mouse droppings were observed in the Laundry, and American Roaches and sewer flies were observed in Building 4B." (Def. Ex. F–1 at 25.) With respect to JATC, two detainees told of rodent activity in the housing areas at night (App. 1 at 11) and Director Feeney's report indicated that rodent infestation was confined to the storehouse. (Def. Ex. F–1 at 19.) In QHD, vermin infestation was confined to a food storehouse and a utility room (Pl.Ex. 365 at E06611–4), however insect and rodent activity was reported by numerous detainee witnesses. In RMSC, vermin infestations were not observed by Director Feeney, (Def. Ex. F–7 at 2) but work order summaries for February–April 2000 indicate vermin infestation in various parts of the facility. (Def. Ex. C–6 at E08363–87.) VCBC's kitchen and dishwasher room were infested with roaches according to Director Feeney's report. (Def. Ex. F–

9 at 1.) However, Director Feeney found the facility housing and support areas to be free from vermin activity and the detainees did not testify to the contrary. (*Id.*, App. 1 at 16.) "A mouse infestation was observed in the commissary" at West Facility.

In summary, the only Department facility which presented with vermin infestation in the residential portion of the facility was AMKC. The mere presence of vermin in a detainee's housing area does not constitute a denial of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. 2392. Nor does subjecting a detainee to a residential setting where there is evidence of vermin activity constitute "punishment" under the *Bell v. Wolfish* standard. Moreover, I note that the Department has recently adopted an Integrated Pest Management (IPM) Program that, according to the plaintiffs' expert, if properly implemented will bring relief in this area. In fact, Dr. Powitz testified that he had observed improvements with respect to vermin prevalence in certain facilities after IPM was introduced. The concern of vermin infestation in food storage and preparation areas is discussed below.

### E. Food Service

The Due Process Clause guarantees pretrial detainees the right to adequate sanitation and adequate and sanitary food. Accordingly, I must review the Department's food service to determine whether there are current and ongoing violations of these rights.

Departmental Directive 3902 (Food Service Sanitation and Health Standards) establishes procedures to ensure that all food service, preparation and storage areas are maintained and operated in sanitary conditions. In OCC Progress Report # 44, submitted to the Court on May 8, 1998, OCC reported that it had conducted an inspection of six Department jails in December 1997 and January 1998 to determine whether facility staff were following the procedures set forth in Directive 3902. (Def.Ex. X–3.) The report found near total compliance (99.3% compliance) with Directive 3902. (Def. Ex. X–4 at E13427.)

The plaintiffs argue that many of the Department's kitchens and food service and preparation areas are unsanitary and thus pose a risk of harm to the plaintiff class. However, as Director Feeney acknowledged, the Department's food service is subject to the regulations of the New York City and New York State health codes and in the eight years that she has been employed by the Department, not one pre-trial detainee has suffered a reportable incident of a food-borne illness. (Tr. 822–24.)

While the notes taken by Director Feeney and Dr. Powitz during their survey of Department kitchens and food service areas noted numerous deficiencies, including dirty equipment, vermin, and inadequate sanitizing equipment (*see* Pl.App. 12) only a few deficiencies could be classified as "critical" and they were confined to the kitchens and food storage areas of ARDC, AMKC, GMDC, GRVC, JATC, and QHD. The remainder of the Department's prisons did not register a single "critical" violation.[20] When asked on cross-examination whether food protection and overall quality control in the Department's kitchens meets current standards, Dr. Powitz responded

---

**20.** Dr. Powitz did not observe any critical violations at the kitchens and food preparation areas in the following areas: BKHD, BXDC, MDC, NIC, RMSC, and West. *See* Pl.Ex. 106 at P00154–59 (BKHD); Pl.Ex. 107 at P000246–52 (BXDC), P000237–45 (MDC), P000252–61 (NIC), P000261–78 (RMSC), P000292–96 (West).

in the affirmative, and also admitted that he rated the food service managers as falling in a range of excellent to fair. (Tr. 1032.)

█ "Generally, a simple health code violation does not offend the constitution." *Capps v. Atiyeh*, 559 F.Supp. 894, 914 (D.Or.1982) (*citing Bell v. Wolfish*, 441 U.S. at 543 n. 27, 99 S.Ct. 1861). Certainly plaintiffs have a right to adequate sanitation and safe food,[21] however plaintiffs have failed to show that the violations compromised this right. In this case, the defendants' sanitary practices with regard to food can be described as "adequate," which is all or more than the constitution requires.

### F. Personal Hygiene & Laundry Services

### i. Supply of Personal Hygiene Items in the Department's Jails

█ "Sanitary living conditions and personal hygiene are among the necessities of life protected by the Eighth Amendment." *Gilland v. Owens*, 718 F.Supp. 665, 684 (W.D.Tenn.1989) (citations omitted); *see also Carver v. Bunch*, 946 F.2d 451, 452 (6th Cir.1991) (allegation of two-week denial of personal hygiene items stated an Eighth Amendment claim); *Chandler v. Baird*, 926 F.2d 1057, 1063–65 (11th Cir.1991) (allegation of confinement without toilet paper, soap and toothpaste supported an Eighth Amendment claim); *Malone v. Colyer*, 710 F.2d 258, 262 (6th Cir.1983) (deprivation of soap, towels, toothbrushes, toothpaste, a laundry service, or other necessities to maintain personal cleanliness states a claim); *Wilson v. Cook County Bd. of Commissioners*, 878 F.Supp. 1163, 1169 (N.D.Ill.1995) (failure

to provide detainee with items to ensure adequate personal hygiene states a claim); *Sanford v. Brookshire*, 879 F.Supp. 691, 694 (W.D.Tex.1994) (conditions that included the lack of hygienic supplies for six days violated the Eighth Amendment); *Williams v. ICC Committee*, 812 F.Supp. 1029, 1032 (N.D.Cal.1992) ("deliberate denial of toilet paper and soap for any extended period" states a claim for the violation of the Eighth Amendment.)

The defendants cite *Green v. Ferrell*, 801 F.2d 765 (5th Cir.1986) for the proposition that "it is not clear that the Department is constitutionally required to provide personal hygiene items to inmates, either generally or in the intake areas." (Def. Mem. at 27, n. 21). However, the *Green* decision states only that where "personal hygiene materials are provided by prisoners' families," and "the jail provides hygienic materials upon request", the district court should not have required provision of additional hygienic materials. *Green*, 801 F.2d at 771. Nonetheless, "[c]ourts are extremely reluctant ... to find constitutional violations based on temporary deprivations of personal hygiene and grooming items...." *Gilland v. Owens*, 718 F.Supp. 665, 684 (W.D.Tenn.1989); *see also Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988) (dismissing claim of convicted prisoner that lack of toilet paper for five days and lack of soap, toothpaste and toothbrush for ten days while confined to a filthy, roach-infested cell violated Eighth Amendment); *Jordan v. Peters*, No. 95 C 4163, 2000 WL 149256, *4 (N.D.Ill. Feb.8, 2000) ("occasional supply disruption or deprivations" in prison's provision of personal hygiene supplies did not constitute Eighth Amendment violation); *Lunsford v. Bennett*, 17 F.3d 1574, 1579–

---

**21.** The due process clause is satisfied as long as detainees are served well-balanced meals, containing sufficient nutritional value to pre-

serve health. *Green v. Ferrell*, 801 F.2d 765, 770 n. 5 (5th Cir.1986).

80 (7th Cir.1994) (dismissing claims of inmates denied toilet paper, personal hygiene items and cleaning supplies for 24–hour period); *Jackson v. DeTella,* 998 F.Supp. 901, 905 (N.D.Ill.1998) (eight-day deprivation of hygiene items and bedding did not violate prisoner's constitutional rights); *Landfair v. Sheahan,* 911 F.Supp. 323, 326 (N.D.Ill.1995) (pretrial detainee's level of hygiene supplies was adequate where county jail distributed supplies on at least 20 days over a three month period).

■ Plaintiffs point out that in *Myers v. Hundley,* the Eighth Circuit concluded that prisons should either provide indigent inmates with hygiene supplies free of charge, or provide such inmates a sufficient allowance with which to buy supplies. 101 F.3d 542, 544 (8th Cir.1996). It is beyond peradventure that detainees should not be forced to choose between purchasing stamps at the commissary for legal mail or personal hygiene supplies. *Id.; Keenan v. Hall,* 83 F.3d 1083 (9th Cir. 1996) (finding indigency standard forcing prisoner to choose between buying hygiene items and legal supplies stated a claim); *Gluth v. Kangas,* 951 F.2d 1504, 1508 (9th Cir.1991) (policy that "forces inmates to choose between purchasing hygienic supplies and essential legal supplies, is 'unacceptable.' ") However, such concerns do not arise in this case, as this Court has previously concluded that Department is in substantial compliance with its obligation to provide stamps to indigent detainees.

Section T of the Stipulation for Entry of Partial Final Judgment requires, *inter alia,* that each detainee, upon admission to the institution, be provided, at the Department's expense, with an issue of personal hygiene items, including but not limited to soap, a toothbrush, toothpaste, a drinking cup, toilet paper, a towel, a comb and a mirror (unless the detainee's cell or housing unit bathroom is equipped with a permanent mirror). All of these items must be replenished or replaced as needed by the institution at the Department's expense.

OCC prepared a report dated February 14, 2000 which details its findings relative to the provision of personal hygiene items to detainees. (*See* Def. Ex. X–1). The report is based on an OCC visit to seven jails to monitor the distribution and replenishment of personal hygiene items. (*See id.* at 1). OCC visited the storehouse and intake area in each facility and noted whether there appeared to be sufficient supplies of personal hygiene items on hand and if all mandated items were routinely issued to new admission detainees. OCC also questioned staff with regard to the procedures for replenishing personal hygiene items and interviewed a random selection of detainees at each facility, asking them if they had been issued all mandated items upon admission to the facility and if they were able to replenish such items as needed.

OCC's findings relative to the supply of personal hygiene items are summarized as follows:

### AMKC

Detainees were issued personal hygiene items upon admission, however OCC's "findings suggested that mandated items were not routinely replenished or replaced as needed by AMKC at the Department's expense." (Def. Ex. X–1 at 4.) However, only a handful of the 120 detainees interviewed were not in possession of all mandated items during OCC's visit. (*Id.*) Moreover, facility staff "confirmed" that personal hygiene items were replenished for indigent detainees. (*Id.*)

### ARDC

Detainees were issued all mandated items upon admission except combs and OCC concluded that "ARDC appeared to

be in substantial compliance with Section T of the Consent Decree." (Def. Ex. X–1 at 3.)

### BKHD

Of the approximately 90 detainees interviewed, only five stated that they did not receive a toothbrush upon admission. (Def. Ex. X–1 at 7.) Housing staff claimed that personal hygiene items were replaced per detainee request, while detainees contended that all replenishment hygiene items had to purchased from the commissary. (*Id.*) All six housing areas visited had adequate supplies of soap and toilet paper. (*Id.*)

### BXHD

Most required personal items were available upon admission, however OCC's "findings suggested that mandated items were not routinely replenished or replaced as needed by AMKC at the Department's expense." (Def. Ex. X–1 at 5.) However, of the approximately 60 detainees interviewed, almost every detainee were in possession of the mandated personal hygiene items with the exception of combs, which were not distributed to any detainee. (*Id.*)

### MDC

Of the approximately 100 detainees interviewed, seven stated they did not receive toothpaste upon admission, four indicated that they did not receive a toothbrush, three claimed they did not receive a towel and one stated that he did not received a plastic cup. (Def. Ex. X–1 at 7.) All detainees appeared to be in possession of the mandated items (except Department-issued combs) when interviewed. (*Id.*) Housing staff claimed that replenishment supplies were obtained from the facility storehouse as needed, while all detainees interviewed stated that replenishment hygiene items must be purchased from the commissary. (*Id.*)

### QHD

According to OCC's report, "[f]acility staff and inmates uniformly stated that [QHD] did not routinely replenish personal hygiene items. Inmates were reportedly required to purchase these items in the commissary." (Def. Ex. X–1 at 6.) However, all inmates appeared to be in possession of the mandated items when interviewed. (*Id.*)

### RMSC

According to OCC's report, "staff and inmates stated that replenishment items were not distributed to inmates because they could be purchased in the commissary." (Def. Ex. X–1 at 2.) However, all inmates appeared to be in possession of the mandated items when interviewed. (*Id.*)

### Summary of Record Relative to Provision of Personal Hygiene Products at Intake

With regard to the remaining prisons, detainee testimony suggests that the Department has no institutional procedure in place for providing the supplies necessary to maintain basic personal hygiene to indigent prisoners. (See Pl.App. 16.) With rare exceptions, the detainee witness testimony does not paint a picture of extreme deprivation in this regard, with the following exceptions: Detainee Jeffrey Powell testified that he and other indigent detainees once endured a two week stretch without toothpaste in GMDC, during which time toothpaste was only available for purchase in the commissary. (Pl.Ex. 16 at 46–47.) Detainee Mary Johnson testified that she has gone as long as two nights without feminine hygiene products and toilet paper. (Tr. 237–38.) However, such testimony captures the worst conditions of an otherwise compliant Department (at least with respect to the availability of personal hygiene products).

The witness testimony, in the aggregate, does not indicate that indigent detainees in the Department's jails experience long-term, repeated deprivations of hygiene supplies in violation of their constitutional rights. Moreover, the OCC report suggests that denial of personal hygiene items is sporadic at worst. On such a record, this Court cannot enter a finding that the plaintiffs are entitled to prospective relief with regard to personal hygiene items under the PLRA.

### ii. Laundry and the Provision of Laundry Detergent in the Department's Jails

 Courts have held that prisoners are entitled under the constitution to have clothing that is clean or to have an opportunity to clean it themselves.[22] *Divers v. Department of Corrections*, 921 F.2d 191, 194 (8th Cir.1990) ("adequate laundry facilities" required); *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir.1989) (under Eighth Amendment, "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time."); *Green v. Ferrell*, 801 F.2d 765, 771 (5th Cir.1986) (when jail inmates were provided with laundry detergent and could wash their clothes in sinks, there was no constitutional violation where jail stays were short averaging ten days for pretrial detainees); *Landfair v. Sheahan*, 878 F.Supp. 1106, 1112 (N.D.Ill.1995) (failure to provide cleaning supplies, clean clothing or a means to wash ones' own clothing stated a claim); *Wilson v. Cook County Bd. of Commissioners*, 878 F.Supp. 1163, 1169 (N.D.Ill.1995) (where pre-trial detainee forced to a single change of clothing for one month, court found that failure to provide clean sheets and clothing when they were available constituted punishment).

Plaintiffs claim that defendants have failed to provide detainees with a consistent, reliable method for cleaning items of personal clothing. On cross-examination, Dr. Powitz testified that the vast majority of the linens which he observed in the Department facilities were clean. (Tr. 1056.) He testified that a sampling of detainees which he spoke with were not aware that the Department offers laundry service for personal clothing. (Tr. 1054.) Indeed, Director Feeney testified that the limited laundry facilities which are available in the jails would not be able to handle even 20 percent of the detainee laundry if all the detainees decided they wanted to use the laundry. (Tr. 996.) Thus, it not surprising that most detainee witnesses testified that they washed their personal clothing in a slop sink (slop sinks also used to clean mops), a communal shower or in a bucket which the department provides to detainees.[23] Detainees

---

**22.** Paragraph D (entitled Laundry Facilities) of the Stipulation for Entry of Partial Final Judgment (dated November 21, 1978) requires the defendants to "provide free laundry service sufficient to provide all detainees with a neat, clean change of clothing and a clean towel at least twice per week" and also states that "defendants shall permit detainees to wash and dry their own laundry in the housing areas." (App. 1 at 4.) It should be noted that this standard requires the Department to provide far more than is constitutionally required with respect to cleaning of personal clothing in jail. In the Department's facilities, detainees may wear their own clothing

brought in from the outside. As the cases cited above make plain, the law requires only that detainees be furnished with running water and laundry detergent to get their clothes clean. Functional washing machines and dryers are niceties not required by the constitution.

**23.** Pl.Ex. 16 at 541 (Amman); Tr. 302–303 (Ramos); T86 (Browne); Pl.Ex. 16 at 47 (Powell); Tr. 179 (Gregory); Tr. 161,165 (R. Jones); Pl.Ex. 15 at T15 (Sherrod); Tr. 219 (Bartee); Tr. 116 (Fischetti); Pl.Ex. 16 at 99 (W.Jones); Pl.Ex. 16 at 372 (Rodriquez); Tr. 350 (Wingate); Pl.Ex. 16 at 426 (Greene);

generally dry their clothing by resting it on furniture or by hanging it on clotheslines made from torn up sheets. Plaintiffs contend that a combination of inadequate ventilation and inadequate heating slows the drying process even further and one detainee witness testified that clothes become mildewed in the time it takes for them to dry. Dr. Powitz testified that mechanical drying of clothing would be preferable in a jail house setting because the "heat and dessication is a form of disinfection." (Tr. 643.)

Dr. Powitz testified that laundry detergent is necessary to remove oils and bacteria from clothing, because "oftentimes bar soap does not remove the oils and bio burdens of personal clothing." (Tr. 641.) Director Feeney testified that one can get clothes clean using bar soap, but admitted that "bar soap is a little more difficult to rinse out." (Tr. 874.) The majority of detainee witnesses testified that they did not have access to laundry detergent in the Department's facilities and used bar soap instead.[24] Director Feeney testified that laundry detergent was available in all the housing areas she visited with Dr. Powitz. By contrast, Dr. Powitz testified that "[w]hen we first got there [detergent was not available.] As we progressed on our tour laundry detergent became available in all the facilities." (Tr. 640.) Plaintiffs contend that "[t]his suggests that the Department changed its practice during [Dr. Powitz's] inspections to conform to the mandates of the Court's order," and argue

Pl.Ex. 16 at 337–8 (John); Tr. 315, 317 (Miles); Pl.Ex. 16 at 138 (Todd); Tr. 284 (R. Johnson); Tr. 142 (Thompson); Tr. 192 (DeRosario); Pl.Ex. 16 at 283 (Roque); Tr. 403 (Fields); Tr. 539(Fry); Tr. 239 (M.Johnson); Pl.Ex. 14 at 22 (Buehler).

24. Tr. 541 (Amman); Tr. 302–03 (Ramos); Tr. 86 (Browne); Tr. 264–65(White); Tr. 179 (Gregory); Tr. 161, 165 (R. Jones); Tr. 116 (Fischetti); Pl.Ex. 16 at 102–03 (W.Jones);

that "prisoner testimony substantiates this conclusion." (Pl. Mem. at 106) (*citing* Tr. 193 (DeRosario got laundry detergent once, the same week of Dr. Powitz' inspection with Legal Aid, but "never before or since"); Tr. 264 (White saw detergent at GRVC only after his deposition.))

On the record before me, I conclude that the defendants' provision of means to clean detainees' clothing is constitutionally adequate.

### G. Sanitation in non-medical areas (includes mental observation units)

Paragraphs S.4 and S.5 of the Stipulation for Entry of Partial Final Judgment dated November 21, 1978, describes the applicable sanitation standards for non-medical and non-food service areas. (*See* App. 1.) Pursuant to Directive 3901, (Def.Ex. F–19) detainee work crews are required to sweep and wash the common areas of housing areas, including bathrooms and day rooms, three times a day.[25] (Def. Ex. F–19 at 3; Def. Ex. X–7 at 108–09.) Fixtures are to be cleaned and sanitized one to three times a day. (*Id.*) Other areas are to be cleaned every two weeks. (*Id.*)

The applicable test here is not whether the Department adhered to the cleaning protocol set forth in the Consent Decree, but whether the Department's facilities are so lacking in adequate sanitation as to be violative of the constitution.

Pl.Ex. 16 at 48 (Powell); Pl.Ex. 16 at 373 (Rodriquez); Pl.Ex. 16 at 338 (John); Tr. 317 (Miles); Pl.Ex. 16 at 173 (Acevedo); Tr. 284 (R. Johnson); Tr. 147 (Thompson); Tr. 192 (De Rosario); Tr. 239 (M.Johnson); Pl.Ex. 14 at 22 (Buehler).

25. Directive 3901 covers all areas but medical areas, which are governed by Directive 3903, Def. Ex. F–22.

The notes of Dr. Powitz (Pl.Ex. 106 & 107 *passim*) and Director Feeney (Pl.Ex. 365 & 366 *passim*) illustrate that, as the defendants admit in their briefs: "deficiencies are scattered throughout the facilities." (Def. Mem. at 67) (arguing that most housekeeping problems are not critical and do not establish constitutional violations). Moreover, the defendants have not refuted the testimony of detainees and Dr. Powitz describing how detainees in AMKC, ARDC, BKHD, BXHD, GMDC, GRVC, MDC, NIC, OBCC, QHD, RMSC, VCBC and West were provided mattresses that were either uncovered or torn (or both, thus rendering the mattresses uncleanable) or soiled. (*See* Pl.App. 14 & 15). The Court finds that detainees are routinely exposed to unsanitary mattresses, which poses a direct risk to health. The question is whether the deficiencies rise to a constitutional level. I find that the cumulative evidence of soiled light shields [26], dirty or clogged ventilation registers, vermin activity, mildewed and decrepit bathroom and shower areas, clogged toilets, dirty janitor's closets,[27] shortages of laundry detergent, and dirty prison cells in combination constitutes a clear deprivation of adequate sanitation in the Department's jails. (*See* Pl.Ex. 106 & 107 *passim*); (Pl.Ex. 365 & 366 *passism*). In addition, Director Feeney's April Report highlights a number of sanitation problems: ARDC: smoke-stained walls in the majority of cells; AMKC: smoke-stained walls in housing areas; GMDC: "modular units and showers present a sanitation problem" (Def. Ex. F–1 at 16); QHD: with regard to housekeeping, "the facility must pay more attention to detail in the housing areas" (*Id.* at 22); GRVC: "[T]he facility must focus more carefully on sanitation. Soap scum and mildew were observed in many showers.... [I]n Building 1A ... [o]ld food trays, paper, and rotted fruit were observed in many cells." (*Id.* at 24–25.)

Once again, as the Supreme Court observed in *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." Accordingly, the parties are directed to submit recommendations for prospective relief governing sanitation in the fourteen facilities at issue within 30 days from the date of this opinion.

## H. Lighting in non-medical areas (includes mental observation units)

In *Hoptowit v. Spellman*, the Ninth Circuit recognized that "[a]dequate lighting is one of the fundamental attributes of 'adequate shelter' required by the Eighth Amendment" and affirmed the district court's determination after trial that lighting was constitutionally inade-

---

26. *See* Section II.H *infra*.

27. Dr. Powitz testified that housing area janitor's closets, in which cleaning equipment is stored, are not kept clean. (Tr. 660, 662–663.) According to Dr. Powitz, mops and other equipment—basic items used to clean the rest of the detainee living areas—were "heavily soiled." (Tr. 660.) Dr. Powitz told the Court that

Janitor closets probably were the dirtiest areas within any [jail housing] block....

Some were clean, but many were not.... The janitor's areas, or the closets, are the work areas for housekeeping, and generally should be the cleanest within a facility.... [T]his is where you start, with clean equipment, clean chemical, clean water, and to go out to affect [sic:effect] housekeeping.... Start off clean, you are going to end up clean. And janitor's closets are critical to that.

(Tr. 662–663.)

quate where "the lighting was so poor that it was inadequate for reading and caused eyestrain and fatigue...." 753 F.2d 779, 783 (9th Cir.1985); *accord, Toussaint v. McCarthy,* 597 F.Supp. 1388, 1409 (N.D.Cal.1984), *aff'd in part and rev'd in part on other grounds,* 801 F.2d 1080 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). Inadequate lighting in jail cells also compromises staff surveillance, and therefore security, and increases the likelihood of accidental injury. Moreover, subjecting a detainee to unlighted housing for lengthy periods of time may adversely impact the psychological well-being of the detainee.

Directive 3900 sets forth the relevant standard for lighting in the Department's jails. (Def.Ex. F–20). The Directive calls for a 10 foot candle standard. (*Id.* at E07051.) The plaintiffs claim that 10 foot candles of lighting is inadequate, citing the American Correctional Association's ("ACA") Standards for Adult Correctional Institutions (calling for "[l]ighting in inmate rooms/cells [that] is at least 20 foot candles at desk level and in personal grooming areas....") (Pl.Ex. 101 at 47) and the APHA's Standards for Health Services in Correctional Institutions (calling for 30 foot candles of lighting in living areas) (Pl.Ex. 102 at 71.) The public health rationale for the latter standard is:

> Adequately illuminated living and working areas provide a beneficial effect to the inmate's general psychological well-being, reduce eye strain and glare, and help prevent headache. Maintenance of adequate illumination minimizes the risk of accidents and is conducive to the performance of work tasks and recreation activities.

*Id.*

Once again, the applicable test here is not whether the Department adhered to Directive 3900 or any professional standard, but whether lighting within the Department's facilities meets constitutional standards.

Dr. Powitz testified that these standards are based on epidemiological evidence relating to "causality of injury or illness and looking at those components in the environment," (Tr. 463) and that his experience indicated a minimum of 20 foot candles was acceptable. (Tr. 460.) However, on cross examination, Dr. Powitz admitted that he had published a column in which he wrote that many prisoners prefer dimmed lights and darker surroundings. (Tr. 1022–23.) Director Feeney testified that in eight years in the Environmental Health Unit, she has known only one detainee to complain of insufficient light. (Tr. 814.)

Defendants also contend that plaintiffs' counsel, Legal Aid Society, as well as OCC, agreed to the 10 foot candle standard when it was presented to Judge Lasker for approval some eight years ago. (Tr. 775–778.) However, there is no evidence in the record that plaintiffs' counsel advocated for the 10 foot candle standard. The Directive in which it is found is, as we know, the result of compromise and negotiation. (*See id.*) The defendants further argue that the 10 foot candle standard is justified by reliance on 29 C.F.R. § 1910.120, a regulation of the Occupational Safety and Health Administration ("OSHA"). (Def. Ex. F–20 at 14 and attachment; Pl.Ex. 104.) Dr. Powitz testified that this standard is not relevant to prison and jail living units, since OSHA regulations are primarily designed for the work environment and do not apply to prisoners, and in any case they apply to an 8–hour workday exposure. (Tr. 464.) As this court observed, the 10 foot candle OSHA standard is also the one that is applicable to "tunnel and shaft heading

during drilling, mucking and scaling." (Tr. 466; Pl.Ex. 104 at 32.) As Dr. Powitz pointed out, 29 C.F.R. § 1910.120 applies to hazardous waste operations and emergency response. (Pl.Ex. 104 at 1; Tr. 465.) Dr. Powitz testified that if any OSHA regulation were to be deemed relevant to prison and jail housing, it would be the regulation for temporary labor camps, 29 C.F.R. § 1910.142, which requires a lighting level of 30 foot candles in living quarters. (Pl.Ex. 105 at 5; T465–67.)

Plaintiffs assert that the defendants themselves seem to have endorsed a 30 foot candle standard, pointing to prior correspondence in which defendants' Deputy Commissioner for Capital Development and Support Services stated, through the Chief of Compliance, that the Department would use a 30 foot candle standard for all new construction and for all cell light retrofitting, and that previously, the ACA 20 foot candle standard had been used. (Pl. Ex. 236, Letter dated November 10, 1993.) Plaintiffs argue that "[t]en foot candles is, in fact, quite a dim light for purposes of activities such as reading, grooming, and letter-writing." (Pl. Mem. at 94.) This Court agrees. The inadequacy of the 10 foot candle standard is made plain by the fact that the Department endorsed an upgrade from 20 foot candles to 30 foot candles in 1993. While this Court will not decide here which standard is appropriate, it is clear that all but a few Department facilities are dimly lit and thus provide constitutionally inadequate lighting.

Inadequate lighting in the Department's jails can be traced to several problems: (1) non-working light fixtures (2) inadequate light bulb wattage and (3) obstructed light shields (also referred to as luminary covers).

With respect to the condition of the light shields, defendants point out that some detainees who prefer dim cell lighting tamper with light shields to provide a dimmer environment. However, in many cases, Dr. Powitz noted that light shields were obstructed simply by accumulated dirt. Defendants' own internal memo shows that the Department has at least begun to contemplate the problem, albeit only after inspections of lighting levels had commenced in preparation for these hearings. On March 30, 2000, defendants' Chief of Management and Planning, Sheila Vaughan, wrote to the Department of Correction's Division Chiefs:

> Recent inspections conducted by the Legal Aid Society revealed that a number of housing areas lacked sufficient lighting for the inmate population. The primary cause of this deficiency was found to be light fixture covers (lenses) obscured by one or more of the following conditions:
>
> — Painted over
> — Blocked by debris (i.e. paper glued to the surface with toothpaste)
> — Stained

(Pl.Ex. 354.) Chief Vaughan went on to direct the facilities to conduct a detailed assessment of lighting in housing areas and submit a realistic schedule for repairing and/or cleaning obscured fixtures by April 7, 2000, and to submit monthly reports until all such deficiencies are corrected. *Id.* Strangely, assuming the direction was followed and there are monthly reports, none were offered into evidence by the defendants.

The following is an overview of the evidence and testimony regarding lighting in the Department's facilities.

### AMKC & ARDC

Dr. Powitz testified that lighting was adequate in "a few areas of the jails", namely AMKC and ARDC. Specifically, he testified that "I think we found at AMKC and ARDC from my inspections in '97 to

date, the department had installed new lighting facilities and indeed those were quite adequate." (Tr. 459.) Detainee Blake Wingate testified that he was kept for two weeks in a cell with water leaking through the light fixture in ARDC–Modular 6 and that the light in the day room in ARDC–Modular 8 was out for a month. (Tr. 343–45.)

### BKHD

Detainee Robert Jones testified that he was left without light in his cell from April to November, despite his complaints. (Tr. 159.) At his deposition, detainee David Breland testified that the on/off buttons get stuck and there is no light. He stated that when correctional staff are informed about the lighting situation, "sometimes they do something [about it] in Brooklyn House" but that "more or less" jail staff concentrate on gallery lights and not personal lights. (Breland Tr., Pl.Ex. 13 at 39–40.) Commissioner Cara testified that "Brooklyn House has requested the touch pad switches for their cells. The light switches where the inmates can individually control the lighting apparently has been damaged and they are trying as a test to do the touch pads." (Tr. 1128–29.)

### BXHD

Dr. Powitz further testified that readings in the dorms were "fine" but readings in the cells were mostly lower "because of either the luminary covers being soiled by the inmates or just discoloring from age or deposition, just poor housekeeping, deposition of environmental tobacco smoke." (Tr. 472.) Defendants' measurements were similar: eight of nine cells had less than 10 foot candles of illumination, and the ninth had only 10.2 at bed level and 13.5 at sink level; lighting in the other cells was as low as 4.3 foot candles at bed level and 5.1 at sink level. (Def. Ex. F–10 at E12878–79.)

Commissioner Cara testified that the jail had ordered 100 stainless steel fixtures for the shower areas, which were expected to arrive within four months of the May Hearings. (Tr. 1164.) He also testified that there is a capital project (which he agreed could take years) in the design phase for the Bronx House, but he did not specify whether that project will involve cell lighting, and he did not dispute that this project could take years. (Tr. 1128, 1165.) However, Commissioner Tsu testified that the Bronx capital project does not call for any replacement of lighting in cells, only in common areas. (Tr. 1212.)

### GMDC

Dr. Powitz testified that he measured lighting levels at "3 to 7 foot candles" in GMDC cells, and that "generally the day rooms and dormitories were okay with notable exceptions." (Tr. 468.) Specifically, he explained that he observed "dorms where significant lights had either burned out or were inoperable. . . ." (Tr. 468.)

### GRVC

Dr. Powitz noted several lights out in residential areas, intake areas, and clinic areas within GRVC, and he also observed dirty luminary covers in a minority of the cells at GRVC. (Pl.Ex. 106 at P00160–70.) Dim lighting below the 10 foot candle level was *not* recorded at GRVC.

### JATC

Dr. Powitz testified that many of the cell lights contained only 34–Watt bulbs. (Tr. 469.) Commissioner Cara testified that a JATC capital rehabilitation project will replace lighting in the cells. (Tr. 1128.) However, Commissioner Tsu testified that the JATC interior renovation project will not include replacing lighting in the cells. (Tr. 1212.) Defendants did not take lighting measurements at JATC.

## MDC

In a sampling of ten cells, Dr. Powitz measured six of the cells as lighted with less than 10 foot candles of light. (Pl.Ex. 107 at P000247, P000248, P000250, 253, 254.) The defendant's measurements of lighting taken on April 24, 2000 in three different cells revealed that all three cells tested measured between 11.2 and 14.6 foot candles. (Def. Ex. F–10 at E12885.)

## NIC

Dr. Powitz testified that the cells, "under the ideal conditions ... with daylight assist" had only 8 foot candles of light. (Tr. 472–73.) He also testified that some of the cells had only 34–Watt bulbs, and that a number of the luminary covers were obscured. (Id.) He reported that day rooms were poorly lit, but that lighting in the dormitories was acceptable. (Tr. 473.)

Defendants' light measurements were consistent with Dr. Powitz's: of four cells measured, one had 10.0 foot candles at desk level and 10.0 at bed level, and another had 11.1 at bed level and 9.6 at desk level; the others were below 10 foot candles, and one measured only 4.4 at bed level and 3.7 at desk level. (Def. Ex. F–10 at E12888.)

## OBCC

Dr. Powitz testified that the best lighting levels were at 11 foot candles, and others were below that level because of soiled or painted luminary covers. (Tr. 474.) Defendants' measurements were similar: of four cells measured, one had 12.1 and 12.9 foot candles at bed and desk respectively; the others had considerably less than 10 foot candles, going as low as 2.9 and 3.9 foot candles. (Def. Ex. F–10 at E12892.) One dormitory had 23.3 in the sleeping area and 11.1 in the day room, and another had 13.4 and 10.6 respectively. (Id. at E12890–91.)

## OHD

Dr. Powitz testified that cells were lit by 34–Watt bulbs. (Tr. 470.) Poor lighting conditions "were exacerbated by placing that 34–watt light behind a luminary cover that may have been stained or painted over. So in some of the cells even though the light was on, my light meter barely registered any kind of discernible light." Even those lights with clean covers did not provide ·20 foot candles of lighting. T470. Dr. Powitz testified that dormitory lighting fell short of 20 foot candles, and that the lighting in the cells was worse. (Tr. 470.) Day room and shower lighting was adequate. (Tr. 470.) Detainee Gamel Browne testified that there was not enough light to read at night; his fixture was covered in dirt and splattered with paint. (Tr. 78–79.) Robert DeRosario testified that he was confined to a cell without a working light for three or four days. (Tr. 196.) Richard Johnson described his light as "a little less than dim," and told of prisoners obscuring their light shields with markers as a result of the officers' leaving the lights on all night. (Tr. 280.) Defendants did not take lighting measurements at QHD. Commissioner Cara testified that QHD had just received 150 4–foot lighting fixtures, which are intended to light corridors, not cells. (Tr. 1164.) He also testified that cell lighting is included in the capital renovation project at QHD, (Tr. 1128) but Commissioner Tsu stated that the Queens renovation project does not involve replacement of cell lighting. (Tr. 1211–12.) Director Feeney's April Report indicates that "[t]he facility submitted a purchase order for new four foot fixtures for the common and dormitory areas." (Def. Ex. F–1 at 21.) The April Report acknowledged that "[i]nadequate lighting was observed in many areas." (Id.)

### RMSC

Dr. Powitz testified that the lighting levels were generally at 10 foot candles "under ideal conditions." (Tr. 473.) Dr. Powitz observed cells with obscured luminary covers, and in some of these, lighting was so low that Dr. Powitz could not get a foot candle reading. (Tr. 474.) In the mental health unit, building 9, there were lights that were out or inoperable. (Tr. 473.) Dormitory light levels were better. (Tr. 474.) Defendants did not take light level readings in RMSC housing areas. (Def. Ex. 11 at E12894–95; Def. Ex. F–12.)

Detainee Kelly Fry testified that she was held in a cell with no light for two weeks despite her complaints. (Tr. 528.) Detainee Valeri Buehler testified that she was held without lighting for three days. (Pl.Ex. 14 at 27.)

### VCBC

Dr. Powitz's survey of VCBC yielded the following observations: (1) only one inoperable light was noted, in the kitchen produce area (Pl.Ex. 107 at P000297); (2) VCBC's Clinic featured "good lighting." (Pl.Ex. 107 at P000298); and (3) in House # 3AB, Dr. Powitz noted that the "lights work." (Pl.Ex. 107 at P000300).

### West

Dr. Powitz testified that in cells, under ideal conditions, lighting levels reached 12 foot candles at the bed and 4 foot candles at the desk in his survey of lighting conditions at West Facility. In addition, he reported that some luminaries were not operating and some fluorescent tubes were burned out. Dr. Powitz also testified that lighting in the dorms was adequate. (Tr. 475–76.) Defendants did not take light measurements at West.

In light of the above, it is clear that detainees in the Department's jails, with the exception of ARDC and AMKC, are subjected to constitutionally inadequate light. The parties are directed to submit recommendations for prospective relief governing lighting in the non-medical areas of all facilities except ARDC and AMKC within 30 days from the date of this opinion. The Court suggests that the parties look to the foot candle standards maintained within ARDC and AMKC as an example of a constitutionally sufficient lighting.

### I. Noise

██ Excessive noise "inflicts pain without penological justification" and may violate the Eighth Amendment. *Toussaint v. McCarthy*, 801 F.2d 1080, 1110 (9th Cir. 1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *accord, Ramos v. Lamm*, 520 F.Supp. 1059, 1063 (D.Colo.1981); *Palmigiano v. Garrahy*, 443 F.Supp. 956, 979 (D.R.I.1977); *Rhem v. Malcolm*, 371 F.Supp. 594, 627–28 (S.D.N.Y.1974), *aff'd*, 507 F.2d 333 (2d Cir. 1974) (level of noise found to constitute a threat to hearing and mental health). To the extent that excessive noise contributes to "difficulty sleeping properly" it affects a "basic daily living requirement" and thus may constitute a deprivation of the minimal requirements for federal constitutional purposes. *Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996)

Diesel generators located near prisoner housing areas of ARDC and RMSC produce not only needed electrical power, but noise levels which according to plaintiffs, "torment" detainees twenty-four hours a day. (Pl. Mem. at 91.) Defendants' expert witness acknowledged that the applicable noise standards for detainee living areas are those of the APHA,[28] (Pl.Ex.

---

**28.** According to the APHA, the public health rationale for the noise standard is

102), and the ACA, (Pl.Ex. 101), both of which set maximum noise levels at 70 decibels during the daytime and 45 decibels at night. (Tr. 878.) [29] Director Feeney measured noise levels in excess of 70 decibels in 3 of 9 cells sampled at ARDC (Def.Ex. F–13) and in excess of 45 decibels in all 9 cells. However, Director Feeney testified that the noise ARDC affects "75 [cells] maybe" out of her estimate of 1800 detainees housed in that jail. (Tr. 880.) No readings were taken by either party at RMSC, which Dr. Powitz testified was not as noisy as ARDC. (Tr. 670–71.)

The defendants argue that no detainee witness complained of excessive noise, nor has Director Feeney received a noise complaint in the last eight years. (Def. Ex. X–7 at 457; T760.) They point out that reliance on the diesel generators is scheduled to come to an end "imminently ... through the replacement for non-emergency use of the last remaining diesel-powered generators on Rikers Island." (Tr. 1112; Def. Ex. T–1 at 4–5, Memorandum dated April 28, 2000.) The department's Memorandum indicates that the plan to "replace two existing emergency generators ... is anticipated to start in July 2000 and completed by September 2001." (Def. Ex. T–1 at 5.) The affected detainees should not be subjected to excessive noise until September 2001, or later, if the project is not completed on time. The parties are directed to submit a summary of where the replacement program is now and whether it is on schedule, along with recommendations for prospective relief governing noise at ARDC and RMSC within 30 days from the date of this opinion.

## J. Medical Areas

Sanitation and lighting in medical areas at the GMDC Infirmary and the RMSC clinic falls below professional standards and violates constitutional standards. However, I find that sanitary and lighting conditions at medical areas in AMKC and NIC had been improved by the time of the May Hearings and thus there is no "current and ongoing violation" of detainees' rights to adequate sanitation in these facilities. However, to the extent that residential lighting in NIC falls below the 20–30 foot candle range, these areas are subject to continuing court supervision relative to lighting.

Dr. Powitz found that the clinic exam cubicles in MDC to be "well lighted." (Pl. Ex. 107 at P000238.) Dr. Powitz specifically noted that the clinics at MDC, QDC, and West Facility were in good condition, (see Pl.Ex. 106 at P00153); (Pl.Ex. 107 at P000238, P000292), and he did not inspect the clinic at JATC. The only vermin observed at the BXDC clinic was a single roach in the bathroom. (Pl.Ex. 365.)

### AMKC Mental Health Center, Lower 1 & 3 (C–71)

Dr. Powitz toured C–71 in November 1999 and again on March 24, 2000. Di-

---

Excessive noise causes irritation, mental and emotional strain, and distraction which may result in increased risk of injury. Noise of sufficient intensity and duration can cause hearing loss, interfere with speech and communication, and contribute to unrest and accidents.
Pl.Ex. 102 at 83.

**29.** Director Feeney also testified about a standard of the federal Occupational Safety and Health Administration (OSHA) that allowed 85 decibels, but admitted that the standard was for workplaces, not living areas, and was limited to 8 hours per day, and 40 hours per week. The OSHA standard is obviously inapplicable to detainees who are confined 24 hours per day, 168 hours per week. As Dr. Powitz indicated in his direct testimony, each increment of 10 decibels reflects a sound level that is "ten times more powerful," i.e., louder in magnitude. (Tr. 668.)

rector Feeney's notes of that visit corroborate Dr. Powitz's testimony that the deplorable conditions witnessed during the first visit had improved. ("Housekeeping had improved but it certainly was not to a level that one would expect....") (Tr. 1039–1041.) Director Feeney's notes of her March 2000 visit indicate multiple "clean cells", "clean linens", "beds made" and a decreased vermin presence. (Pl.Ex. 366 at E06715–6.) However, peeling paint and rust were observed in the shower in Lower 1. (Pl.Ex. 365 at E06715.)

### GMDC Infirmary

Dr. Powitz's notes taken during an inspection tour of the GMDC Infirmary indicate that sanitation was "poor." (Pl.Ex. 106 at P00082.) In addition, storage containers were soiled and there was soil buildup in corners. (*Id.*) Dr. Powitz testified that expired medication was found in the medication room. (Tr. 626.) Lighting at the preparation counter was measured at 10 foot candles. The defendants have not taken issue with this description of the GMDC Infirmary in their brief or notified the court of any improvements.

### NIC Infirmaries and Medical Areas

The overall condition of medical areas and infirmaries in NIC was, according to Dr. Powitz (a prison observer for many years) "probably the worst I have seen in many, many years." (Tr. 617.) NIC has a seven story main building housing general population and protective custody prisoners, in which is the "Main" clinic. It also has a 283 bed dormitory annex which houses infirmary patients, and the "Annex" clinic is located therein. Dorm 4 in the Annex houses patients with AIDS.

In the Annex Clinic, which treats only infirmary patients, Dr. Powitz found a "basic lack of good infection control practices." (Tr. 617.) Director Feeney testified that she observed during her March 20, 2000 inspection tour that the treatment room counter and the medical equipment were "filthy." (Tr. 963–64.) Dr. Powitz testified that he believed handwashing sinks were not being used because the sinks were dry. (Tr. 619; Pl.Ex. 107 at P000260.) During the inspection tour, the medication rooms had poor sanitation, and the medication counter was excessively dirty. (Pl.Ex. 107 at P000260, Tr. 963.) Medication cassettes were "grossly soiled." (Tr. 619–20.) Tables in the medical station area were "filthy." (Tr. 965.) Personal items were stored where the dispensing of drugs was taking place. (Tr. 617; Tr. 1049.)

In addition, Dr. Powitz testified "I saw there the dirtiest phlebotomy area I have ever in my career...[it] was pretty grim. Here it was a question of a ... cloth chair and obviously stained and soiled to a point where it could not longer be cleaned. And the entire area around it was soiled. So the housekeeping within that clinic area was extremely poor." (Tr. 615–16.) The chair was extremely soiled and it had visibly soiled absorbent under pads (or "Chucks") on top of the seat. (Tr. 1050; Pl.Ex. 107 at P000259; Tr. 961.) Other Chucks pads were taped to windows to prevent inmates from seeing into the clinic area (Tr. 617–618; T1050; Pl.Ex. 107 at P000259.) And other Chucks pads were used as shelf liner in working areas. (Pl. Ex. 107 at P000260.) According to Dr. Powitz, the use of Chucks pads to cover surfaces in this way was done "about 20 years back ... but that was rapidly found to be a breach of good infection control practice and it's no longer done." (Tr. 618.)

According to Dr. Powitz, medical storage was not conducted in a sanitary manner. (Tr. 618–19.) Dr. Powitz explained that materials, such as irrigation fluid, once opened, should be used within one calendar day to limit the risk of contamina-

tion. (Tr. 619.) However, during his tour in March, an open bottle of sterile water dated January 4th was noted; as were three other open but undated bottles of water. (Tr. 961.) Sterile water is used as an irrigation fluid, to clean open wounds, for example. Ms. Feeney conceded that it is an inappropriate practice for a medical facility to have open, undated bottles of sterile water. (Tr. 961.)

In Dorm 1, the shower wall finish was in poor condition and there was pooling water on the floor with scaling dirt, along with a trip hazard on the floor. Many beds in Dorms 1 and 2 were less than 6 feet apart. (Pl.Ex. 107 at P000258–59.) In Dorm 2, the wheel chair ramp to the shower is made of wood and presents a risk of injury. (Tr. 714–715; *see also* Pl.Ex. 182 (photo of ramp).) In addition, Dr. Powitz found the floor and sill in the 2B shower were uncleanable. (Tr. 714; *see also* Pl. Ex. 181 (photo).)

In the Main clinics, for the non-infirmary population in the main building at NIC, environmental health conditions were also hazardous. Sterile supplies were stored with non-sterile, resulting in potential cross contamination. (Tr. 620.) According to Dr. Powitz's notes, it was very dusty, and there was no privacy in the examination areas. (Pl.Ex. 107 at P000255.) In addition, the 6th floor clinic lacked a toilet in the waiting area. (*Id.*)

Director Feeney testified that she observed sanitary conditions in the NIC dorm nurse's station and medication room which were unacceptable during her March 20, 2000 inspection tour and that she instructed Zoe Cleris, director of nursing for the City's Health and Hospital Corporation, to correct the situation. (Tr. 965–66.) She also testified that she spoke to Paul Falk, the director of operations at St. Barnabas Hospital, the institution charged at the time with, *inter alia*, main-

taining the medical equipment at NIC. (Tr. 967.) Director Feeney testified that "I have conducted subsequent inspections and the clinic is clean, the treatment rooms were clean. The equipment was clean." (Tr. 968.) In a seven-page letter to the Court discussing conditions in the Department's medical areas, Elizabeth Loconsolo, the Department's General Counsel, reported that during an unannounced April 24, 2000 tour of the NIC clinics and third floor triage area, she found the previously compromised areas to be "clean and well maintained." (Letter of Elizabeth Loconsolo, Esq. addressed to Hon. Harold Baer, Jr., dated April 25, 2000). Ms. Loconsolo also related that the filthy cloth-covered chair had been replaced by a vinyl-covered chair. (*Id.*)

### RMSC Clinic

Director Feeney's notes taken during a tour of the RMSC clinic on March 21, 2000 can be summed up in the following notation: "Clinics don't meet veternary [sic] standards." (Pl.Ex. 366 at E06690.) Defendants make much of the fact that Dr. Powitz mistakenly identified dried red paint splatters on the floor in the triage area and near an examination cubicle as dried blood. (Def. Mem. at 77.) Lighting was also insufficient for medical tasks in the RMSC clinic. In her April 25, 2000 letter, Ms. Loconsolo stated that an update on conditions at RMSC would be forthcoming. To date, this Court has not received correspondence indicating that conditions have improved. Thus, this Court can only conclude that conditions remain below veterinary standards.

In summary, the sanitary and lighting conditions at the GMDC infirmary and the RMSC clinic are constitutionally inadequate and accordingly, the parties are directed to submit recommendations for prospective relief governing sanitation and lighting in the medical areas of these facili-

ties within 30 days from the date of this opinion.

### K. Modular Units

The conditions in the modular housing units are and have been such as to warrant separate treatment. Specifically, the modular units are plagued by inadequate ventilation, air temperature extremes, deteriorated bathrooms and showers, and compromised sanitation. Modular housing units were designed as temporary housing and according to Director Feeney, they have an average life expectancy of five years. (Tr. 991.) The oldest modular units on Rikers were erected in the mid–1980's. (Pl.Ex. 317 at 2) (Board of Correction Meeting Minutes for March 17, 2000). Accordingly, some of the modular units have exceeded their useful lifespan by more than a decade.

During the administration of Mayor Koch, the Department was ordered to release detainees to comply with findings of jail overcrowding, and modular units were erected as an emergency response to a shortage of beds. (Id.) Last year, then-Commissioner Bernard Kerik acknowledged that the modular units must be replaced, and Deputy Commissioner Antonio Figueroa developed a replacement program, as part of the Department's 10–year capital plan, to replace 5,300 beds at a cost of $898 million. (Id.) The 4–year capital plan calls for the replacement of 2,150 beds at a cost of $271 million. (Id.) Assistant Commissioner Tsu testified that the modular replacement housing was scheduled to begin in October 2000 and would take two years to complete.

In the meantime, the Department is replacing the heat pumps in the modular units with heat pumps that, sadly, were not designed to work efficiently in temperatures below 20 degrees Fahrenheit. (Tr. 1161.) Approximately half of the deteriorating showers in the modular units were

replaced by the time of the May Hearings, and all showers in modular units are scheduled to be replaced. (Tr. 1129.)

The defendants are directed to inform the Court of a schedule whereby the use of constitutionally substandard modular units will be phased out by the middle of 2003.

### III. CONCLUSION

For the reasons set forth above, the defendants' motion to terminate provisions of the Consent Decrees with respect to environmental health conditions is denied in part and granted in part. This Court has determined that there is a continuing and ongoing violation of the basic right to adequate ventilation in ARDC, GMDC, GRVC, JATC, MDC, NIC, OBCC, QHD, and the mental observations units at AMKC, and the intake areas at RMSC. Accordingly, as noted above in section II.A of this opinion, the parties are directed to submit recommendations for prospective relief governing ventilation in these facilities within 30 days from the date of this opinion. For the reasons set forth above, this Court will direct OCC to monitor comprehensively the temperature at the above listed facilities this winter and again in the summer season to determine whether continuing and ongoing relief is warranted or whether the risk to human health has been abated. With regard to the plumbing, vermin control, food service, personal hygiene and laundry, this Court has found no ongoing violation of federal law. With regard to sanitation in non-medical areas, sanitation in the RMSC clinic and the GMDC infirmary, and lighting, the parties are directed to submit recommendations for prospective relief governing these areas as set forth above.

**SO ORDERED.**